**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| AMDOCS (ISRAEL) LIMITED, an Israeli Corporation,<br><br>            Plaintiff,<br><br>    v.<br><br>OPENET TELECOM, INC., a Delaware Corporation, and OPENET TELECOM LTD., an Irish Corporation,<br><br>            Defendants. | Case No. 1:10-CV-910 (LMB/TRJ)<br><br>**JURY TRIAL DEMANDED** |

**<u>MEMORANDUM IN SUPPORT OF OPENET'S PROPOSED CLAIM
CONSTRUCTIONS AND MOTION FOR SUMMARY JUDGMENT
OF NON-INFRINGEMENT AND INVALIDITY</u>**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

    A.    Overview of the Parties and Patents-in-Suit ........................................ 1

    B.    Overview of Arguments on Summary Judgment.................................. 2

        1.    The '797 Patent Is Not Infringed for Two Separate Reasons ................... 2

        2.    The '984 and '510 Patents Are Not Infringed For Two Separate
            Reasons ............................................................................................ 4

        3.    The '065 Patent Is Not Infringed and Is Invalid ........................................ 5

II.    CLAIM CONSTRUCTION ISSUES ............................................................... 6

    A.    Disputed Claim Terms ........................................................................ 6

        1.    Amdocs Seeks to Improperly Limit the Terms "Network
            Accounting Record," "Network Entity," and "Data Collector" to
            "IP and/or Packet-Based Networks" ................................................. 6

        2.    Amdocs Seeks to Improperly Limit "First Source" and "Second
            Source" to Different Types of Information.................................. 8

        3.    "Single Records Represent[ing] Each of the Plurality of Services" .......... 9

            a.    Construction of "Single Record" ......................................... 10

            b.    There Is No Written Description for the Plurality of
                 Services Identified in the Single Record..................................... 11

    B.    Indefinite Claim Terms ........................................................................ 13

        1.    "real time" ('797: claims 1, 7, 19; '510: claim 16; '984: claims 1,
            13) .................................................................................................. 13

        2.    "identifying a plurality of services carried out over a network"
            ('797: 1, 7) ..................................................................................... 14

        3.    "enhancing" (and variations thereof) ('065: 1, 7; '797: 1, 7, 19) ........... 15

        4.    "completing" ('510: 16; '984: 1, 13) ...................................................... 15

    C.    The "Computer Readable [Storage] Medium" Claims Are Not Directed To
        Patentable Subject Matter ................................................................. 16

III.    STATEMENT OF UNDISPUTED FACTS ..................................................... 17

    A.    Facts Relevant to Non-Infringement of the '797 Patent ....................... 17

    B.    Facts Relevant to Non-Infringement of the '984 and '510 Patents ..................... 19

    C.    Facts Relevant to Non-Infringement and Invalidity of the '065 Patent.............. 20

IV.    OPENET DOES NOT INFRINGE THE PATENTS-IN-SUIT...................................... 24

    A.    '797 Patent: The Accused Products Do Not Contain a Graphic User Interface "Allowing the User to Choose At Least One of the Listed Functions To Be Applied to the Chosen Field".................................................. 24

    B.    '797 Patent: The Accused Products Do Not Generate a "Single Record Represent[ing] Each of the Plurality of Services" On a Network ...................... 25

    C.    '984 and '510 Patents: Openet Does Not "Collect[ ] Network Communications Usage Information In Real-Time From a Plurality of Network Devices At a Plurality of Layers"......................................................... 25

    D.    '984 and '510 Patents:  Openet Does Not Generate Reports "On The Collection of the Network Usage Information from the Network Devices" ....... 26

    E.    '065 Patent: Amdocs Identifies No Code Performing The Claimed Functions...................................................................................................................... 27

V.    THE '065 PATENT IS ANTICIPATED BY THE PRIOR ART '443 PATENT ........... 28

    1.    The '443 Patent Discloses Each Limitation of Each Asserted Claim...... 28

    2.    The '065 Patent Is Invalid Regardless of Claim Constructions............... 30

VI.    CONCLUSION............................................................................................................. 30

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007)........................................................................7

*Agilent Technologies, Inc. v. Affymetrix, Inc.*,
   567 F.3d 1366 (Fed. Cir. 2009)......................................................................12

*American. Piledriving Equipment, Inc. v. Geoquip, Inc.*,
   --- F.3d --, 2011 WL 1045360 (Fed. Cir. Mar. 21, 2011)..............................9

*Andersen Corp. v. Fiber Composites, LLC*,
   474 F.3d 1361 (Fed. Cir. 2007)......................................................................16

*Ariad Pharmaceuticals., Inc. v. Eli Lilly & Co.*,
   598 F.3d 1336 (Fed. Cir. 2010)......................................................................12

*Bilski v. Kappos*,
   130 S. Ct. 3218 (2010)....................................................................................17

*CLS Bank International v. Alice Corp. Pty, Ltd.*,
   2011 U.S. Dist. LEXIS 23669 (D.D.C. Mar. 9, 2011)..................................17

*Cybersource Corp. v. Retail Decisions, Inc.*,
   620 F. Supp.2d 1068 (N.D. Cal. 2009) .........................................................17

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline*,
   349 F.3d 1373 (Fed. Cir. 2003)......................................................................13

*Honeywell International, Inc. v. International Trade Commission*,
   341 F.3d 1332 (Fed. Cir. 2003)..........................................................9, 13, 15

*In re Katz Interactive Call Processing Patent Litigation*,
   --- F.3d --, 2011 WL 607381 (Fed. Cir. Feb. 18, 2011)................................8

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995)...........................................................................6

*Martin v. Mayer*,
   823 F.2d 500 (Fed. Cir. 1987).........................................................................12

*Miles Laboratories, Inc. v. Shandon Inc.*,
   997 F.2d 870 (Fed. Cir. 1993)..........................................................................6

*Morton International, Inc. v. Cardinal Chemical Co.*,
    5 F.3d 1464 (Fed. Cir. 1993)......................................................................13

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005)..................................................................16

*In re Nuijten*,
    500 F.3d 1346 (Fed. Cir. 2007)..................................................................17

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004)....................................................................6

*Regents of the University of California  v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997)....................................................................6

## DOCKETED CASES

*Glory Licensing LLC v. Toys R′ Us, Inc.*,
    No. 09-4252 (D.N.J. May 16, 2011)............................................................17

## FEDERAL STATUTES

35 U.S.C. §§ 101 ..........................................................................................1, 16

35 U.S.C. § 102(e)(2)........................................................................................28

35 U.S.C. § 112 .......................................................................................1, 6, 11

## MISCELLANEOUS

*Subject Matter Eligibility of Computer Readable Media*, in Off. Gaz. Pat &
    Trademark Office 1351, 212 (January 26, 2010).........................................16

I.    **INTRODUCTION**

Summary judgment should be granted because Amdocs has no evidence of infringement and because the four patents-in-suit are invalid.[1]  Despite having full access to Openet's source code, reviewing over one million pages of production documents, and deposing a dozen witnesses, Amdocs has no evidence that the software sold by Openet in the United States:

- Includes a graphic user interface that allows the user to select a function to be applied to specific data fields within a record, as required by the '797 patent.

- Generates a single record representing each of the plurality of services, as required by the '797 patent.

- Includes the additional software code needed to generate the reports on the collection of network usage information claimed by the '984 and '510 patents.

- Collects network usage information in "real time," as claimed by the '984 and '510 patents and as Amdocs proposes that claim term be construed.

- Includes the additional software required to perform the correlation and enhancement steps claimed by the '065 patent.

Because Amdocs cannot meet its burden of proving infringement, its infringement claims should be dismissed.  In addition, summary judgment of invalidity is appropriate because the asserted claims of the '065 patent are anticipated by prior art U.S. Patent No. 5,784,443 and because each patent contains claims that are invalid under 35 U.S.C. §§ 101 and/or 112.

A.    **Overview of the Parties and Patents-in-Suit**

The patents-in-suit relate to telecommunications network data mediation.  When a person makes a telephone call, sends a text message, or downloads content to a mobile phone, call detail records ("CDRs") are generated by the network. Mediation software mediates (processes and formats) the CDRs for later use by the network's particular billing system.

---

[1]        The four patents-in-suit and asserted claims are U.S. Patent Nos. 6,836,797 ("the '797 patent"), claims 1, 2, 7, 8, and 19; 6,947,984 ("the '984 patent"), claims 1, 2, 6, 8, and 13; 7,412,510 ("the '510 patent"), claims 16, 17, and 19; and 7,631,065 ("the '065 patent"), claims 1, 4, 7, 13, and 17.  The patents-in-suit are attached hereto as, respectively, Exhibit A-D.

Openet is a small Irish company with U.S. headquarters in Reston, Virginia. It supplies

mediation software to AT&T, Verizon, Sprint, and others under the FusionWorks brand name.[2]

Amdocs is a large Israeli company whose main business is its proprietary billing system. Indeed,

there are installations where companies use Openet software, with the knowledge and

acquiescence of Amdocs, to mediate CDRs for later use in an Amdocs billing system. The

patents Amdocs accuses Openet of infringing were acquired by Amdocs in 2004 as part of its

acquisition of a near bankrupt company (XACCT Technologies) that was unable to compete in

the ultra-competitive mediation software marketplace. Amdocs now offers versions of the

XACCT mediation software.

### B.    Overview of Arguments on Summary Judgment

#### 1.    The '797 Patent Is Not Infringed for Two Separate Reasons

First, to distinguish the '797 patent over prior art, the patentees claimed a very specific

graphic user interface ("GUI") that defined how data fields within a record are modified after the

CDRs are collected. The claimed GUI requires three distinct steps: (1) "listing a plurality of

available functions to be applied in real-time prior to end-user reporting," (2) "allowing a user to

choose at least one of a plurality of fields," and (3) "allowing the user to choose at least one of

the listed functions to be applied to the chosen field in real-time prior to the end-user reporting."

Thus, the claimed GUI requires choosing functions to be applied to individual fields within a

record. The GUI in FusionWorks, pictured below, only allows the user to apply functions (called

"rules" in FusionWorks ) to records (called "events").

---

[2]       Openet also offers other non-mediation products under the FusionWorks brand name (including
FusionWorks Balance Manager, Network Edge Rating, Convergent Charging, and Policy Manager). Amdocs also
accuses those products of infringing the '065, '797, and '510 patents on the basis that those products are part of the
"FusionWorks Framework," but Amdocs' infringement allegations relate only to mediation. Thus, as used in this
brief, "FusionWorks" refers only to FusionWorks Convergent Mediation. Further background information on the
accused Openet products is found in the Declaration of Joseph Hogan, filed herewith.



*Figure 8-5          Enter Mapping Dialog*

FusionWorks lacks the claimed requirements of listing functions, choosing at least one field, and applying at least one listed function to the chosen field, and Amdocs identifies no evidence of such capabilities.  Instead, Amdocs alleges infringement on the basis that events are comprised of fields, but that eviscerates the requirement of "allowing the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting" and rewrites the claim as selecting functions to be applied to events rather than to fields.  Moreover, Amdocs' technical expert, Dr. Ellen Zegura, admitted "an event is not the same thing as a field."  *See* Zegura Dep. at 74:23-25.[3]

Second, the '797 patent claims "collecting data describing [a] plurality of services" and "generating a single record including the collected data, wherein the *single record represents each of the plurality of services*."  '797 patent, claims 1 and 7 (emphasis added).[4]  Openet never consolidates CDRs from different services (*e.g.*, email, Internet, text messages) into a single record representing each of the services.  Instead, Openet generates one record for each type of service – a practice the '797 patent identifies as prior art.  A side-by-side comparison of the prior art method disclosed in the '797 patent practiced by Openet and the claimed single record reflecting each of the plurality of services is below:

---

[3]      Cited excerpts from the May 6, 2011 deposition of Dr. Zegura are attached hereto as Exhibit E.

[4]      Claim 19 similarly claims Claim 19 claims "collecting data with different formats describing a plurality of services" and "describing users of the services" and then "generating a single record including the collected data representing each of the services and the users."



'797 Patent, Fig. 2 (Prior Art)

'797 Patent, Fig. 6 (Claimed Invention)

Amdocs again lacks any proof that Openet generates a single record representing each of the plurality of services.  In fact, Dr. Zegura has never seen the data records generated by FusionWorks.  *See* Zegura Dep. 63:21-64:10, 66:14-67:4.  Amdocs alleges that generating a single record from multiple data sources meets this claim limitation, but sources are not services, and moreover, the record generated is at most an aggregation of sources and does not represent each of the plurality of sources or services.

2.    <u>The '984 and '510 Patents Are Not Infringed for Two Separate Reasons</u>

First, the claims of the '984 and '510 patents require "collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers."  The term "real-time" is a general and amorphous concept, not a specific parameter that defines the metes-and-bounds of the patent claims.  The term "real-time" is thus insolubly ambiguous and the '984 and '510 patents should accordingly be held invalid as indefinite.[5]  However, to the extent "real-time" is construed as Amdocs proposes to mean "in a manner which ensures no more than a fixed latency," the accused products do not infringe this claim limitation.

---

[5]    The claim term "real time" also appears in the '797 patent and raises the same indefiniteness issues.

The latency of FusionWorks (the time it takes to process data) is variable and therefore does not collect events in a manner that ensures no more than a fixed latency.  Indeed, the collection of CDRs by FusionWorks can fall behind the processing of CDRs and is therefore not in a manner which ensures no more than a fixed latency.  Additionally, Amdocs has not identified any FusionWorks performance data or conducted any tests to demonstrate that FusionWorks collects CDRs in a manner which ensures no more than a fixed latency.

Second, the '984 and '510 patents require submitting queries to a database containing network usage information (e.g., CDRs) to "retriev[e] information on the collection of the network usage information from the devices."  FusionWorks does not provide the user with the capability to retrieve reports on the collection of the network usage information from the devices.  Instead, a user is required to write additional code, called DataStream Decoder (DSD) scripts, to perform reporting on the collection of network usage information.[6]  Openet has not provided any of its U.S. customers with such DSD scripts.  Not surprisingly, Amdocs identifies no DSD scripts supplied or written by Openet for any U.S. customers for this purpose, and Dr. Zegura did not consider DSD scripts as part of her infringement opinion.  *See* Zegura Dep. 18:22-20: 21.

3. The '065 Patent Is Not Infringed and Is Invalid

Amdocs has no proof that FusionWorks infringes the asserted claims of the '065 patent.  The '065 patent claims correlating and enhancing data records.  FusionWorks requires DSD code to correlate and process data records, but Dr. Zegura admitted she is "not prepared to give an opinion" on whether Openet infringes the '065 patent if DSD code is required to implement those claimed functions.  *See* Zegura Dep. 26:6-11.

---

[6]     DSD scripts are also referred to by Openet as DSD codes, rules, business rules, and/or business logic.

Moreover, the '065 patent claims decades old mediation processes, and its claims are anticipated by the '443 patent.  Hoping to save the validity of its patent, Amdocs now seeks claim constructions that improperly limit the '065 claims to "IP and/or packet-based networks," but even with Amdocs' proposed claim restrictions, the '443 patent discloses each limitation of each asserted claim of the '065 patent.

## II.   CLAIM CONSTRUCTION ISSUES

Patent validity and infringement are both two-step analyses.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004).  In both inquiries, the first step is to determine the meaning and scope of the asserted claims.  *Id.*  During this step the court may find that a claim term fails to comply with the written description or definiteness requirements of 35 U.S.C. § 112 and hold the patent invalid without proceeding to the second step.[7]   The second step is the same whether conducting an anticipation (invalidity) or infringement inquiry.   When considering invalidity, the construed terms are compared to the prior art, and when considering infringement, the construed terms are compared to the accused device.  *Markman*, 52 F.3d at 976.

### A.   Disputed Claim Terms

1.   Amdocs Seeks to Improperly Limit the Terms "Network Accounting Record," "Network Entity," and "Data Collector" to "IP and/or Packet-Based Networks"

| Claim Term | Openet Proposed Construction | Amdocs Proposed Construction |
|---|---|---|
| network accounting record ('065, claims 1, 4, 7) | A record that accounts for network usage | A record reflecting one or more transactions on an IP and/or packet-based network. |

---

[7]     To satisfy the written description requirements, "a patent specification must describe an invention and do so in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention." *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997).   To satisfy the definiteness requirements, a claim, read in light of the specification, must apprise those skilled in the art of the scope of the claim.  *See Miles Labs., Inc. v. Shandon Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993).

| network entity ('065, claim 13) | Device or software in a network from which data can be collected. | A source of data <u>on an IP and/or packet-based network</u>. |
| data collector ('065, claims 13 and 17) | Device or software that collects data from network entities | Software and/or hardware for collecting data from entities <u>on an IP and/or packet-based network</u>. |

The difference between the parties' constructions is that Amdocs seeks to limit the terms to "IP and/or packet-based network."  Amdocs' constructions are wrong for three reasons.

First, the specification of the '065 patent does not limit the network to an IP or packet-based network:

> Although the above description of the system 100 has been IP network focused with Unix or Windows NT systems supporting the elements, <u>other networks (non-IP networks) and computer platforms can be used.</u>

'065 patent, 15:21-27 (emphasis added).

Second, Amdocs' efforts to rewrite its claims to save their validity is wrong as a matter of law.  In *Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007), the terms "transverse" and "perpendicular" were used throughout the specification, but only "transverse" appeared in the claims.  *Id.* at 807.  The Federal Circuit rejected a proffered construction that limited "transverse" to "perpendicular: "[t]he patentees knew how to restrict their claim coverage to holes passing through at right angles.  They could have used the word 'perpendicular,' as they did in discussing their preferred embodiment.  Instead, they chose a different term that implies a broader scope."  *Id.*  As in *Acumed*, the intrinsic record confirms that the patentee knew how to restrict its claim coverage to "IP and/or packet-based networks" but did not do so.  Specifically, the patentee utilized both "IP network[s]" (15:22-23) and "network" (2:25-26) in the '065 specification, but chose to claim only the broader term "network."  Amdocs cannot now erase that unambiguous claim drafting choice through claim construction.

-7-

Third, Amdocs' effort to exclude a disclosed embodiment from the scope of the claims is presumptively wrong under Federal Circuit law. *E.g.*, *In re Katz Interactive Call Processing Patent Litig.*, --- F.3d ---, 2011 WL 607381, at *14 (Fed. Cir. Feb. 18, 2011) ("there is a strong presumption against a claim construction that excludes a disclosed embodiment"). Here, the patentee specifically emphasized in the specification that certain embodiments utilized non-IP networks. '065 patent, 15:21-24 ("In some embodiments, other platforms are used . . . [O]ther networks (non-IP networks) and computer platforms can be used."). Accordingly, Amdocs' attempts to exclude a disclosed embodiment should be rejected.

In contrast to Amdocs' constructions, Openet's constructions are fully supported by the plain language of the claims and the specification, both which refer broadly to networks.

2.    Amdocs Seeks to Improperly Limit "First Source" and "Second Source" to Different Types of Information

| *Openet Proposed Construction* | *Amdocs Proposed Construction* |
|---|---|
| Two distinct sources of network accounting information | first source: a source of network information<br><br>second source: a source of network information of a different type than the information from the first source |

The claim terms "first source" and "second source" appear in independent claims 1 and 7 of the '065 patent in the context of "receiving from a first source a first network accounting record" and "correlating the first network accounting record with accounting information available from a second source." The claims thus plainly indicate that the first source and second source are two distinct sources.

Amdocs' proposed construction permits the second source to be the same source as the first source but yield "information of a different type." Even if the sources are different, nothing in the patent indicates that the first and second source must produce information of a "different type." While the asserted patents make it clear that the information may be of different types,

-8-

there is no support for the idea that this is compulsory.  Notably, the Federal Circuit has declined

to read limitations into claims in this precise circumstance:

> [American Piledriving] again contends that the court improperly
> imported a limitation from the preferred embodiment into the
> claims. This court agrees.  The claims recite that "said eccentric
> weight portion" has "at least one insert-receiving area formed
> therein." . . . <u>Nothing in the independent claims requires or
> specifies that the insert-receiving area extend fully through either
> the eccentric weight or the gear portion.</u> Although the specification
> states that "[t]he bottom portion of the counterweight is cast having
> insert receiving areas or bores substantially parallel to the center
> bore and extending fully through the gear portion and fully through
> the eccentric weight portion" . . . <u>the intrinsic record is devoid of
> anything to suggest or indicate that the bore must *always* extend
> fully through either portion.</u>

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 2011 WL 1045360, at *9 (Fed. Cir. Mar. 21, 2011)

(emphasis added).  Additionally, Amdocs' construction that the information must be of a

different undefined "type" (with no further guidance concerning the meaning of "type") does not

provide adequate guidance regarding the meaning of the disputed terms.  *Honeywell Int'l, Inc. v.

Int't Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003) ("Competitors trying to practice the

invention or to design around it would be unable to discern the bounds of the invention.").

3.      "Single Records Represent[ing] Each of the Plurality of Services"

| Claim Term | Openet Proposed Construction | Amdocs Proposed Construction |
|---|---|---|
| record | An ordered set of fields representing separate data items. | One or more fields of data treated as a unit and describing one or more transactions. |
| single record | A rolled up record reflecting all collected data fields | One record. |

The term "single record" appears in claims 1, 2, 7, 8, and 19 of the '797 patent.  The

related term "record" appears in all four patents.  Aside from Amdocs' attempt to add the

limitation "describing one or more transactions" to the definition of record (and there is no basis

to include such language in the definition), there is little difference between the parties' proposed

constructions of record.  Indeed, both parties seem to agree that records are a collection of data

fields.  However, as set forth below, the parties' greatly differ in their constructions of single

record.  Further, the term "single record" lacks adequate written description.

> a.      Construction of "Single Record"

The ability to collect data and generate a "single record" of all services provided to a

customer is essential to the claimed invention of the '797 patent.  The '797 patent describes

"prior art methods of organizing accounting information" where each service was represented by

a "single service data block."  '797 Patent, Col. 1:53-65.  As depicted in Figure 2 (copied below)

of the '797 patent, if two services were used, two records were generated:



The '797 patent taught that "[w]hile these [prior art] methods of accounting for network

usage are somewhat effective," generating a different record for each service "failed to allow

versatility" in billing systems as the number of services delivered over a network increased, thus

there was "a need for a technique of rolling up service accounting information" into a single

record.  Col. 1:66-2:9.  The '797 patent therefore developed a method of "rolling up the services

into a single data block" that "may be sent to a Business Support System (BSS) for the purposes

of billing at least one recipient of the services."  Col. 4:9-14.  Instead of generating multiple

records for the services consumed by a customer, one rolled-up record reflecting all services

consumed by the customer is generated, as depicted in Figure 6 of the '797 patent, copied below:



Accordingly, consistent with the teachings of the '797 patent, single record should be construed to mean a "rolled up record reflecting all collected data fields."  Openet's proposed construction is consistent with how single record is used in the asserted claims of the '797 patent.  Claims 1 and 7 of the '797 patent claim "collecting data describing [a] plurality of services" and then "generating a single record including the collected data, wherein the single record represents each of the plurality of services."  Likewise, Claim 19 claims "collecting data with different formats describing a plurality of services" and "describing users of the services" and then "generating a single record including the collected data representing each of the services and the users."  Thus, the asserted claims make clear the single record of the '797 patent reflects all collected data fields.

Amdocs' proposed construction of a "single record" as "one record" is a tautology that ignores the teachings provided in the specification of the '797 patent and the context in which the claim term appears and should be rejected.

           b.      There Is No Written Description for the Plurality of Services Identified in the Single Record

Apart from the dispute over what the claim term "single record" means, the '797 patent fails to provide adequate written description of the plurality of services from which the single record is created, as required by 35 U.S.C. § 112, ¶ 2.  The '797 patent requires that "the single record represents each of the plurality of services; wherein the services include at least two services selected from a group consisting of a hypertext transfer protocol (HTTP) session, an electronic mail session, a multimedia streaming session, a voice over Internet Protocol (IP)

session, a data communication session, an instant messaging session, a peer-to-peer network application session, a file transfer protocol (FTP) session, and a telnet session." However, there is no disclosure in the '797 patent of instant messaging services.

"[T]he test for sufficiency [of written description] is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*). "It is not a question of whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure, [r]ather, it is a question [of] whether the application necessarily discloses that particular device." *Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987) (emphasis in original, internal citations omitted). In particular, "[t]he written description doctrine prohibits new matter from entering into claim amendments, particularly during the continuation process." *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366, 1379 (Fed. Cir. 2009). Thus, written description is "an objective inquiry into the four corners of the specification" to determine whether "the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351

Here, the above listing of the plurality of services was added to all claims of the '797 patent by amendment to overcome prior art. The patentee chose to provide a detailed and exhaustive list of the types of services that the claimed single record reflects. But in so doing, the patentee claimed beyond what was disclosed by the inventors in the specification. Nothing in the four corners of the '797 patent shows that the inventors ever had in their possession the claimed single record reflecting instant messaging services as one of the services; the patent is invalid for failing to comply with the written description requirement.

B.     **Indefinite Claim Terms**

1.     "real time" ('797: claims 1, 7, 19; '510: claim 16; '984: claims 1, 13)

| Openet Proposed Construction | Amdocs Proposed Construction |
|---|---|
| This claim term is indefinite. | In a manner which ensures no more than a fixed latency. |

Real time appears in the '984 and '510 patent in the claim limitation "collecting network communications usage information in real-time from a plurality of network devices" and in the '797 patent in the claim limitation "listing a plurality of functions to be in real-time prior to end user reporting."  In each instance, "real time" is indefinite, as it is an amorphous term that does not define the boundaries of the patent claims – a process that is fast enough to be real time to one person skilled in the art may not be real time to another person.  Indeed, as Dr. Zegura testified, the meaning of "real time" varies based on the context:

> Q. So if the process had a fixed latency of one day, that would still be real-time?
> A. It depends upon the context.
> Q. So it would change depending on the context?
> A. The context does matter with respect to the fixed latency and that's a component of definition of real-time.

May 6, 2011 Zegura Dep. 84:13-20.  *See Geneva Pharms., Inc. v. GlaxoSmithKline*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) (definition that varies by context is "epitome of indefiniteness").

The inventors also could not agree on a single definition of real time.  Inventor Tal Givoly testified that "everyone has their own notion of what real-time means."  Feb. 11, 2011 Givoly Dep. 481:13-14 (Exh. H).  Similarly, inventor Limor Schweitzer testified that "the definition of 'real time' varies widely with the application."  Feb. 24, 2011 Schweitzer Dep. 130:19-22 (Exh. I).  If the inventors cannot agree on a definition of real time, "[c]ompetitors trying to practice the invention or to design around it would be unable to discern the bounds of the invention."  *Honeywell*, 341 F.3d at 1341; *see also Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993) ("Since the evidence shows that the claims at issue here are

-13-

not sufficiently precise to permit a potential competitor to determine whether or not he is infringing, we also agree with the district court's determination that the claims are invalid for failure to satisfy the definiteness requirement of section 112, second paragraph.").

Amdocs' proposed construction of "in a manner which ensures no greater than a fixed latency" should be rejected, as it is unsupported by the specification of the patents. The term real time does not appear in the specification of the '984 and '510 patents. Amdocs' construction parrots a passage of the '797 specification that states "[i]n the context of the present description, a 'real-time' environment is that which ensures no more than a fixed latency." '797 Patent, Col. 4:55-56. But this sentence is not purporting to define real time as used in the patent claim and rather refers to "a table [that] may be constructed in the manner shown to present a real-time view of the total resource consumption for all multi-party customers." *Id*. at 4:51-54.

Further, the above passage was added to the '797 specification by a continuation-in-part filed after the November 20, 1997 filing date claimed by Amdocs for the '984 and '510 patents. Because an equivalent statement is not found in the specification of the '984 and '510 patents, the term real time still should be held indefinite in the context of those two patents regardless of the Court's construction of "real time" in the context of the '797 patent.

2.      "identifying a plurality of services carried out over a network" ('797: 1, 7)

| Openet Proposed Construction | Amdocs Proposed Construction |
|---|---|
| Indefinite. If construed, it refers to analyzing network data records to identify the services associated with each such record. | establishing the identity of more than one service carried out over an IP and/or packet-based network |

The claim term "identifying a plurality of services carried out over a network" fails to convey the scope of the patent claim. For example, it is unclear who is required to identify a plurality of services carried out over a network or whether the services must be identified before data is collected. The specification provides no clarity for what actions are required to infringe,

or avoid infringing, this claim.  Thus, this claim limitation is invalid as indefinite.  But if not

indefinite, Openet has proposed a construction that addresses the above issues.

Amdocs' construction fails to provide clarity to this claim term and should be rejected;

stating that "identifying" means "establishing the identity" is circular.  Additionally, Amdocs

again resorts to adding the "over an IP and/or packet-based network" limitation to the claim

term; for the reasons discussed above, there is no basis to add this limitation to the claim term.

3.      "enhancing" (and variations thereof) ('065: 1, 7; '797: 1, 7, 19)

| Openet Proposed Construction | Amdocs Proposed Construction |
|---|---|
| Indefinite.  If construed, it refers to field enhancement, as disclosed in the patents. | To add or to modify information in a record. |

The claim term "enhancing" (and variations, such as "enhancement procedure") does not

have an ordinary and customary meaning to one skilled in the art, and indeed, any processing of

data could be characterized as an enhancement.  Should the term be construed it should be

limited to field enhancement procedures described in the '797 patent, where the user selects

specific functions to be applied to specific fields of a record.  '797 patent, Col. 12:44-13:47.

Amdocs' proposed construction of adding or modifying data fails to define the scope of

this claim, as it risks a finding of infringement under one interpretation and no infringement

under another interpretation.  *See Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1340 (Fed. Cir.

2003).  For example, it is unclear whether certain additions or modifications of a record are

enhancements under Amdocs' construction.

4.      "completing" ('510: 16; '984: 1, 13)

| Openet Proposed Construction | Amdocs Proposed Construction |
|---|---|
| Indefinite. | Enhancing to generate a complete record. |

The claim term "completing" is indefinite because the notion of completing a record is

purely subjective, as more information can always be added to a record.  Further, Amdocs'

-15-

construction of "completing" to mean "enhancing to generate a complete record" is circular, and

defining completion in terms of enhancement violates the doctrine of claim differentiation, as

enhancement appears in the claims of the related '065 and '797 patents.  *See Andersen Corp. v.*

*Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) ("different words or phrases used

in separate claims are presumed to indicate that the claims have different meanings and scope");

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) (doctrine applies

when different patents share common parent application and specification).   Enhancing and

completing must mean different things, but the patents provide no guidance as to how

completing differs from enhancement or when a record is complete.

### C.      The "Computer Readable [Storage] Medium" Claims Are Not Directed To Patentable Subject Matter and Therefore Are Invalid

Each patent-in-suit includes "computer readable medium" or "computer readable storage

medium" claims.  Claim 1 of the '065 patent claims "[a] computer program embodied on a

computer readable storage medium for processing networking accounting information," Claim 7

of the '797 patent claims "[a] computer program embedded into computer readable medium for

generating a single record reflecting multiple services for accounting purposes," and Claim 13 of

the '984 patent and Claim 16 of the '510 patent both claim "[a] computer program product

embedded into computer readable medium for reporting on the collection of network usage

information from a plurality of network devices."  These claims embrace non-patentable subject

matter and are invalid under 35 U.S.C. § 101 for two reasons.

First, the Patent Office recognized that "the broadest reasonable interpretation of

[computer readable media] . . . includes signals *per se*," therefore claims directed to computer

readable media "must [be] reject[ed] as covering both non-statutory subject matter and statutory

subject matter" unless expressly limited to non-transitory embodiments.  *See USPTO Guidelines*

*for Subject Matter Eligibility for Computer Readable Media*, January 26, 2010 (citing *In re Nuijten*, 500 F.3d 1346, 1356-1357 (Fed. Cir. 2007)).  Because the above claims include no such limitations, they are invalid as claiming non-patentable subject matter.

Second, the computer readable media claims are directed to an abstract idea.  *See Bilski v. Kappos*, 130 S. Ct. 3218, 3230 (2010).   The claims do not "sufficient[ly] tie a process claim to a particular machine."  *Cybersource Corp. v. Retail Decisions, Inc.*, 620 F. Supp.2d 1068, 1077 (N.D. Cal. 2009).  As a practical matter, network accounting and usage information must be processed on a computer.  The claims thus recite "an obvious mechanism for permitting a solution to be achieved more quickly, *i.e.*, through the utilization of a computer for performing calculations."  *CLS Bank Int'l v. Alice Corp. Pty, Ltd.*, 2011 U.S. Dist. LEXIS 23669, *61 (D.D.C. Mar. 9, 2011).  Likewise, the claims recite methods that "[o]n their face . . .  simply obtain and compare intangible data" relating to the usage of telecommunications services without ever transforming the data.  *Cybersource Corp. v. Retail Decisions, Inc.*, 620 F. Supp. 2d 1068, 1073 (N.D. Cal. 2009); s*ee also Glory Licensing LLC v. Toys 'R' Us, Inc.*, No. 09-4252, D.I. 55 at 8 (D.N.J. May 16, 2011) (invalidating patents that "claim processes involving the extraction of information entered into and stored in a document or file and the formatting and transmission of that information to an application program").

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   Facts Relevant to Non-Infringement of the '797 Patent

1.   Amdocs accuses Openet's FusionWorks products of infringing claims 1, 2, 7, 8, and 19 of U.S. Patent No. 6,836,797 ("the '797 patent").

2.   Claim 1 of the '797 patent claims a "method for generating a single record reflecting multiple services for accounting purposes, comprising:

   (a)   identifying a plurality of services carried out over a network;

(b)    collecting data describing the plurality of services; and

(c)    generating a single record including the collected data, wherein the single record represents each of the plurality of services; wherein the services include at least two services selected from a group consisting of a hypertext transfer protocol (HTTP) session, an electronic mail session, a multimedia streaming session, a voice over Internet Protocol (IP) session, a data communication session, an instant messaging session, a peer-to-peer network application session, a file transfer protocol (FTP) session, and a telnet session;

wherein the data is collected utilizing an enhancement procedure defined utilizing a graphic user interface by: listing a plurality of available functions to be applied in real-time prior to end-user reporting, allowing a user to choose at least one of a plurality of fields, and allowing the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting."

3.    Claim 7 is directed towards "a computer program product" and includes the same limitations as claim 1.

4.    Claim 19 claims "a method for generating a single record reflecting multiple services" and includes the limitations of, *inter alia*, "generating a distinct record including the collected data of each of the single records" and "wherein the data is collected utilizing an enhancement procedure defined utilizing a graphic user interface by: listing a plurality of available functions to be applied in real-time prior to end-user reporting, allowing a user to choose at least one of a plurality of fields, and allowing the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting."

5.    In FusionWorks, records (including CDRs) are called events.  Events are comprised of fields.  Declaration of Joseph Hogan ("Hogan Decl."), ¶ 17.

6.    An event is different from a field.  *See* Zegura Dep. 74:23-25.

7.    Records are processed according to functions (called "rules" in FusionWorks). FusionWorks includes a graphic user interface (GUI) that allows the user to select "rules" that are applied to an event when the event is processed.  Hogan Decl. ¶ 19.

8.      Rules are applied to all fields in an event.  The FusionWorks GUI does not allow rules to be applied to a specific field within an event.  Hogan Decl. ¶ 20.

9.      When events are processed, events of the same service type (*e.g.*, voice, data) can be consolidated into one record.  Records reflecting different services can only be aggregated into a file containing multiple records of different service types.  Hogan Decl. ¶ 21.

10.     Aggregated records are not a single record.  *See* Zegura Dep. 94:24-99:23.

**B.**     **Facts Relevant to Non-Infringement of the '984 and '510 Patents**

1.      Amdocs accuses FusionWorks of infringing claims 1, 2, 6, 8, and 13 of U.S. Patent No. 6,947,984 ("the '984 patent") and claims 16, 17, and 19 of U.S. Patent No. 7,412,510 ("the '510 patent").

2.      The '984 and '510 patents claim software and methods for "reporting on the collection of network usage information from a plurality of network devices."

3.      Each asserted claim of the '984 and '510 patents requires (a) "collecting network communications usage information in real-time from a plurality of network devices,"[8]  (b) "filtering and aggregating the network communications usage information," (c) "completing a plurality of data records from the filtered and aggregated network communications usage information," and (d) "storing the plurality of data records in a database."

4.      The asserted claims of the '984 patent additionally require (e) "allowing the selection of one of a plurality of reports for reporting purposes," (f) "submitting queries to the database utilizing the selected reports for retrieving information on the collection of network usage information from network device," and (g) "outputting a report based on the queries."

---

[8]     The '984 patent claims additionally specify the network devices from which usage information is collected.

5.      The asserted claims of the '510 patent include the additional limitations of "wherein resource consumption queries are submitted to the database utilizing the reports for retrieving information on resource consumption in a network" and "wherein a resource consumption report is output based on the resource consumption queries."

6.      FusionWorks includes a "statistics system, which enables statistics definition, delivery, and storage."  Hogan Decl. ¶ 23.

7.      The statistics system does not natively collect statistics and generate reports; instead additional computer code – written in DataStream Decoder (DSD) format – is required to collect statistics and generate reports.  Hogan Decl. ¶ 25.

8.      Openet has not provided DSD code to a U.S. customer for purposes of network usage reporting (Hogan Decl. ¶ 26), and Amdocs has not identified any such DSD code.

9.      The statistics system does not enable, with or without DSD code, reporting on the collection of network usage information at each network device; instead, the statistics system reports on the internal operation of FusionWorks.  *See* Hogan Decl. ¶ 24.

10.     FusionWorks does not process events according to a fixed latency.  *See* Hogan Decl. ¶ 27.  Because system latency varies, FusionWorks does not ensure the collection and processing of events within a  fixed latency, and at any given time, the collection of events can exceed the latency of the system.  *Id*. at ¶ 28.

C.      **Facts Relevant to Non-Infringement and Invalidity of the '065 Patent**

1.      U.S. Patent No. 7,631,065 ("the '065 patent") was filed December 7, 2001 and claims priority to a provisional application filed November 20, 1997.  Amdocs alleges a conception date no earlier than July 30, 1997.[9]

---

9       For purposes of this summary judgment motion, Openet uses the earliest priority and conception dates alleged by Amdocs.  Openet does not concede that Amdocs is entitled to those dates.

2.      Amdocs accuses Openet of infringing claims 1, 4, 7, 13, and 17 of the '065 patent. In its infringement contentions, Amdocs alleges that the Correlation and Transaction Engine (CTE) in the FusionWorks Framework performs the claimed correlation and enhancement steps.

3.      The CTE is a rules driven engine.  In other words, it requires DSD rules to perform any correlation or processing functions.  Hogan Decl. ¶¶ 7-8; *see also* Deposition of Alan McNamee at 75:17-79:7, 95:12-17, 101:22-102:11, 131:20-133:14  (attached as Exhibit F).

4.      Amdocs has identified no such DSD rules.  In fact, Dr. Zegura admitted that "[she's] not prepared to give an opinion" concerning whether there is infringement if the DSD code is required to perform the functions provided by the CTE.  Zegura Dep. 26:6-11

5.      Prior art U.S. Patent No. 5,784,443 ("the '443 patent") (Exhibit G) was filed by MCI Corporation on February 1, 1996 and issued July 21, 1998.

6.      The '443 patent "relates to systems and methods for creating and maintaining records of customers' use of the resources of a communications network . . . in a fast and versatile manner to provide billing and statistical information."  '443 Patent, Col. 1:7-11.

7.      The '443 patent discloses "a telecommunications network which provides means to compile and correlate all usage records created by a specific call as it is transmitted through a communications network."  Col. 1:54-57.

8.      The '443 patent discloses collecting data from multiple sources, including multiple "packet-switched data sources."  Col. 3:25-26; *see also* Fig. 3 (identifying three "packet sources"); Fig. 5 (identifying "switch data sources" and "packet-based sources").

9.      The '443 patent discloses collecting and processing data from multiple services, *i.e.*, "[t]he communication network . . . may well provide services other than POTS (plain old telephone service)."  Col. 3:22-23.  *See also* Col. 3:24-26 ("the network may be accessed by

-21-

dedicated access terminals, as well as, packet-switched data sources based on other networks").

10.    The '443 patent discloses multiple network entities, such as "[s]witches 310 and 312" which receive data from multiple "packet sources."  Associated with and coupled to each switch is a collector, or "local record store."  "[A]t each site, a record is created of the event and placed in a local record store 321, along with the associated call tag."  *See* Col. 2:50-58; Fig. 3 (depicting data sources, network entities, and collectors).



11.    The '443 patent discloses that after the network records have been created and collected, the records are correlated based on information contained in the records: "real-time event correlation stage 524 accepts individual records from capture stage 523 and, based on the associated call tags, combines them into a single record that preferably provides an end-to-end view of the event."  Col. 3:56-59.

12.    The '443 patent discloses that the correlated records are enhanced in the reformatting and enhancement module; the module "accepts records compiled within real-time correlation stage 524 and creates a standard record of a form used throughout the remainder of system." Col. 3:65-4:1; *see also* Fig. 5 ("correlation" and "reformat and enhance" steps).



13.     The '443 patent discloses that the records are enhanced or augmented using information from the collected and correlated records.  *See* Col. 4:5-7 ("Individual fields from prior records are collected and grouped into physical segments within the standard record."); Col. 4:9-10 ("Fields within the output record are byte-aligned into character and binary numerical fields").  Further, "[a]fter a standard record of an event has been created, it may be augmented with additional information."  Col. 4:14-15.

14.     The '443 patent discloses processing records based on a policy, such as a time-out period.  *See* Col. 3:59-64 ("High-speed matching of records with the same call tag value is carried out until all expected records have been combined, or until a certain time-out period (*e.g.*, 30 minutes) has passed since the last known even record has been created.").

IV.      **OPENET DOES NOT INFRINGE THE PATENTS-IN-SUIT**

      A.      **'797 Patent: The Accused Products Do Not Contain a Graphic User Interface "Allowing the User to Choose At Least One of the Listed Functions To Be Applied to the Chosen Field"**

The '797 patent relates to methods and systems for collecting and processing data from a network. Each asserted claim of the '797 patent includes the following specific limitation:

> wherein the data is collected utilizing an enhancement procedure defined utilizing a graphic user interface by: [1] listing a plurality of available functions to be applied in real-time prior to end-user reporting, [2] allowing a user to choose at least one of a plurality of fields, and [3] allowing the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting.

The patentee added this limitation to each claim of the '797 patent to distinguish the patent over prior art. While the '797 patent ultimately issued based on this amendment, these limitations now distinguish the '797 patent over the accused products. FusionWorks does not "allow[ ] a user to choose at least one of a plurality of fields, and allow[ ] the user to choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting." The GUI in FusionWorks only allows the user to choose rules (functions) to be applied to events. No GUI allows the user to choose the fields within an event to which a rule is applied, as required by the claims.

Despite lacking the required specific GUI, Amdocs alleges infringement by arguing that because the user can define the fields in an event, selecting the rules to be applied to an event amounts to selecting rules to be applied to the field. However, the GUI where rules are selected to be applied to events does not allow the selection of fields. Thus, this infringement theory eliminates the requirement that the user "choose at least one of the listed functions to be applied to the chosen field in real-time prior to the end-user reporting." Further, the claims plainly contemplate that all requirements are satisfied by a single GUI.

**B.      '797 Patent: The Accused Products Do Not Generate a "Single Record Represent[ing] Each of the Plurality of Services" On a Network**

FusionWorks does not perform the steps of "collecting data describing [a] a plurality of services" and "generating a single record including the collected data, wherein the single record represents each of the plurality of services," as required by claims 1, 7, and 19 of the '797 patent. Rather than generating a single record representing each of the plurality of services, FusionWorks aggregates data collected from multiple sources.

Amdocs has identified no evidence that the claimed single record is generated at any U.S. installations or that Openet has delivered software capable of generating such a single record. Further, Dr. Zegura has never seen the records output by Openet's software. Zegura Dep. 63:21-67:4. Because Amdocs has no proof of infringement, summary judgment should be entered.

**C.      '984 and '510 Patents: Openet Does Not "Collect[ ] Network Communications Usage Information In Real-Time From a Plurality of Network Devices At a Plurality of Layers"**

Each asserted claim of the '984 and '510 patent requires "collecting network communications usage information in real-time from a plurality of network devices at a plurality of layers." Openet contends "real-time" is insolubly ambiguous and thus the asserted claims are invalid as indefinite. However, if real time is construed as Amdocs proposes to mean "in a manner which ensures no more than a fixed latency," FusionWorks does not infringe.

Because FusionWorks has a variable latency, it does not and cannot ensure events are collected in a manner that ensures no more than a fixed latency. Hogan Decl. ¶ 26. The latency of FusionWorks varies depending on a variety of factors, including the number of events processed and the computing resources available to process incoming events. When the processing of events slows down, system latency increases and the collection of events slows down to the point of not being able to collect and process events as they are received. *Id*. at ¶ 27.

-25-

Dr. Zegura admitted that if a system does not guarantee that events are processed as they are received, the system is not "real time" under Amdocs' interpretation of the term:

Q.   Sure.  How long of a delay can Openet put into its system to make sure that it is not operating in real-time?
A.   If the operation does not keep up with events as they're being generated in normal circumstances, then that does not constitute real-time.
Q.   In your definition of real-time, what does ensure mean?
A.   Ensure means guaranteeing in normal circumstances.

Zegura Dep. 85:24-86:9.  Because the collection and processing of events within a fixed latency is not guaranteed in FusionWorks, the accused products do not collect network usage information in real time as required by the claim under Amdocs construction.

**D.    '984 and '510 Patents:  Openet Does Not Generate Reports "On The Collection of the Network Usage Information from the Network Devices"**

Each asserted claim of the '984 and '510 patents requires submitting queries to a database containing network usage information statements for the purpose of "retrieving information on the collection of the network usage information from the devices."  Amdocs has identified no evidence that any Openet product sold and delivered in the U.S. meets this claim limitation.

As an initial matter, although FusionWorks contains a rudimentary statistics tool, additional code, written in DataStream Decoder (DSD) format, is required to retrieve information from a statistics library and to generate a report with those statistics.  Hogan Decl. ¶ 25.  Amdocs has identified no such DSD code written by Openet for any U.S. customer for this purpose, and Dr. Zegura did not consider DSD code in her infringement analysis.  Zegura Dep. 18:22-20:10.  Accordingly, summary judgment can be entered solely on the basis of Amdocs' failure of proof.

Nonetheless, assuming *arguendo* that such code existed, the FusionWorks statistics system can only generate reports on the operation of FusionWorks itself – for example, the overall number of records processed by the FusionWorks system.  Hogan Decl. ¶ 24.  Even though FusionWorks can be configured to work with collectors of information from network

devices, FusionWorks lacks the ability to generate the claimed reports "on the collection of the network usage information from the devices."   In other words, the FusionWorks statistics system reports on the processing of events within FusionWorks, not on the collection of events from network devices.  Indeed, Openet's customers typically use their own software to generate the latter such reports.  Hogan Decl. ¶ 26.  Because FusionWorks lacks the capability to generate reports on the collection of network usage information from network devices, the accused products do not infringe the '984 and '510 patents.

> ### E.       '065 Patent: Amdocs Identifies No Code Performing the Claimed Functions

Amdocs has identified no evidence that Openet has provided software needed to infringe the '065 patent.  Claims 1 and 7 of the '065 patent require "correlating [a] first network accounting record with accounting information available from a second source" and "using the accounting information with which the first network accounting record is correlated to enhance the first network accounting record."  Likewise, claim 13 requires "an enhancement component that augments data in one of the records . . . with data from a different one of the records."

Amdocs' alleges that the Correlation and Transaction Engine (CTE) in the FusionWorks Framework performs the claimed steps, but Amdocs learned early in the case that the CTE does not itself perform any functions and requires specific DSD code to correlate and process data. Section III.C.3, *supra*.  However, Dr. Zegura admitted she was "not prepared to give an opinion" on infringement if DSD code was required.  Zegura Dep. 26-6-11.  Because Amdocs cannot identify specific DSD code delivered to a specific U.S. customer that actually performs the claimed steps of the '065 patent, summary judgment of non-infringement should be entered.

V.      **THE '065 PATENT IS ANTICIPATED BY THE PRIOR ART '443 PATENT**

1.      The '443 Patent Discloses Each Limitation of Each Asserted Claim

35 U.S.C. § 102(e)(2) states that a patent is invalid as anticipated when "the invention

was described in . . . a patent granted on an application for patent by another filed in the United

States before the invention by the applicant for patent." The '443 patent is prior art to the '065

patent, as its filing date (February 1, 1996) predates the '065 patent's alleged invention date

(June 30, 1997). As set forth in the following claim charts, the '443 patent anticipates each

limitation of each asserted claim of the '065 patent, making summary judgment of invalidity

appropriate.[10]

| '065 Patent | '443 Patent |
|---|---|
| 1. A computer program product embodied on a computer readable storage medium for processing network accounting information comprising: | "[A] telecommunications network which provides means to compile and correlate all usage records created by a specific call as it is transmitted through a communications network." Col. 1:54-57 |
| computer code for receiving from a first source a first network accounting record; | "At each site, a record is created of the event and placed in a local record store. . . ." Col. 2:56-58. |
| computer code for correlating the first network accounting record with accounting information available from a second source; and | "[R]eal-time event correlation stage 524 accepts individual records from capture stage 523 and, based on the associated call tags, combines them into a single record that preferably provides an end-to-end view of the event." Col. 3:56-59. |
| computer code for using the accounting information with which the first network accounting record is correlated to enhance the first network accounting record. | Correlated records are "sent downstream to stage 525" (the "reformat and enhance" stage), which "creates a standard record" by adding or modifying information in one record with information from another record. Col. 3:65-4:1. For example, "[i]ndividual fields from prior records are collected and grouped into physical segments within the standard record" |

---

[10]     Because Claims 1 and 7 of the '065 patent contain identical limitations – with claim 1 claiming a "computer program product" and claim 7 claiming an identical "method" – the same analysis applies for both claims and a claim chart is only provide for claim 1. Also, because claim 4 is dependent on claims 2 and 3 (which are not asserted), claim charts are provided for claims 2, 3, and 4.

| | |
|---|---|
| | and "[f]ields within the output record are byte-aligned into character and binary numerical fields." Col. 4:5-9. |
| 2. The computer program product embodied on a computer readable storage medium of claim 1, wherein the enhancement is based on a policy. | The enhancement occurs "until all expected records have been combined, or until a certain time-out period (*e.g.*, 30 minutes) has passed since the last know even record has been created." Col. 3:59-64. Thus, the policy for enhancing records is that records are processed until all expected records are received or until a time-out period is reached. |
| 3. The computer program product embodied on a computer readable storage medium of claim 2, wherein the accounting information includes parameters and wherein the using comprises adding at least one parameter from the accounting information to the first network accounting record. | The records contain fields (parameters). "Individual fields from prior records are collected and grouped into physical segments within the standard record." Col. 4:5-7.  "After a standard record of an event has been created, it may be augmented with additional information." Col. 4:14-15. |
| 4. The computer program product embodied on a computer readable storage medium of claim 3, wherein the accounting information is in the form of a second network accounting record. | Each record is "a record . . . of the event" and is therefore an accounting record. Col. 2:57. Because the information in the enhanced record comes from "prior records," there are multiple records and thus the accounting information is in the form of a second (or third or fourth) network accounting record. Col. 4:5. |
| 13. A system for collecting data from network entities for a data consuming application, comprising: | "[A] telecommunications network which provides means to compile and correlate all usage records created by a specific call as it is transmitted through a communications network." Col. 1:54-57. |
| a plurality of data collectors to receive information from the network entities and to produce records based on the information, each data collector in the plurality of data collectors being associated with and coupled to a different one of the network entities; and | Multiple "local record storage sites" (collectors) are associated with and coupled to different switches (network entities). "At each site, a record is created of the event and placed in a local record store 321, along with the associated call tag." Col. 3:56-58. |

| | |
|---|---|
| an enhancement component that augments data in one of the records produced by one of the plurality of data collectors with data from a different one of the records produced by another of the plurality of data collectors. | In the "reformat and enhance" module (Fig. 5), "[i]ndividual fields from prior records are collected and grouped into physical segments within the standard record" and "[f]ields within the output record are byte-aligned into character and binary numerical fields." Col. 4:5-9. |
| 17. The system of claim 13, further comprising: a module coupled to the plurality of data collectors, the module receives the records produced by the plurality of data collectors for aggregation purposes, and wherein the enhancement component resides in the module. | The "real time processor" is coupled to the local record storage sites (Fig. 3) and includes "real time event correlation" processes and a "reformat and enhance" accounting records (Fig. 5). |

2.      The '065 Patent Is Invalid Regardless of Claim Constructions

The '443 patent anticipates the '065 patent regardless of which party's claim constructions are adopted.  For example, even if "network accounting record," "network entity," and "data collector" are construed as Amdocs requests to refer only to "IP and/or packet-based networks," the '443 patent collects and processes data from "packet-based sources."  Likewise, even if "first source" and "second source" are construed as Amdocs requests to require two different sources, each reflecting different services, the '443 patent collects records from a variety of "packet-based sources" and "switch data sources."

VI.    **CONCLUSION**

For the foregoing reasons, summary judgment of non-infringement and invalidity should be entered.

Dated: May 26, 2011

Respectfully submitted,

/s/ James H. Wallace, Jr.

James H. Wallace, Jr. (admitted *pro hac vice*)
Eric H. Weisblatt (VSB No. 21561)
Anthony H. Son (admitted *pro hac vice*)
Brian H. Pandya (VSB No. 72233)
Adrienne G. Johnson (VSB No. 78631)
Joseph Shin (VSB No. 79051)
WILEY REIN LLP
1776 K Street NW
Washington, D.C. 20006
Telephone: (202) 719-7000
Facsimile: (202) 719-7049

*Counsel for Defendants Openet Telecom, Inc.*
*and Openet Telecom Ltd.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's EM/ECF system on this 26th Day of May 2011, with other counsel of record being served by hand delivery, copy via electronic mail.

<u>/s/ Brian H. Pandya</u>
Brian H. Pandya