**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| AMDOCS (ISRAEL) LIMITED, an Israeli Corporation, | ) ) ) |
| | ) Case No. 1:10-cv-910 (LMB/TRJ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| OPENET TELECOM, INC., a Delaware Corporation, and OPENET TELECOM LTD., an Irish Corporation, | ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF AMDOCS (ISRAEL) LIMITED'S MOTION FOR PROPOSED CLAIM CONSTRUCTIONS AND PARTIAL SUMMARY JUDGMENT OF NO INVALIDITY AND NO INEQUITABLE CONDUCT**

James L. Quarles III
Gregory H. Lantier
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006

Nels T. Lippert, *pro hac vice*
S. Calvin Walden, *pro hac vice*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, NY 10022

i

## Table of Contents

I.     Introduction ...................................................................................................................1

II.    Background of the Technology and the Patents-in-Suit ..................................................2
       1.    The Parties .......................................................................................................2
       2.    Amdocs' Patents-in-Suit ..................................................................................3

III.   Amdocs' Proposed Claim Constructions ........................................................................9
     A.    "Record" ('065 Patent: Claims 1, 4, 7, 13, 17; '797 Patent: Claims 1, 2, 7, 8, 19;
           '510 Patent: Claim 16; '984 Patent: Claims 1, 13) ...............................................10
     B.    "Network Accounting Record" ('065 Patent: Claims 1, 4, 7) ..............................13
     C.    "First Source" and "Second Source" ('065 Patent: Claims 1, 7).........................15
     D.    "Report" ('510 patent: Claims 16, 17; '984 patent: Claims 1, 2, 13) ..................17
     E.    "plurality of layers" ('510 patent: Claim 16; '984 patent: Claims 1, 13) .............18
     F.    "Filtering" ('510 patent: Claim 16; '984 patent: Claim 1, 13) .............................19
     G.    "Aggregating" ('510 patent: Claim 16; '984 patent: Claim 1, 13); "Aggregation"
           ('065 patent: Claim 17) .......................................................................................19

IV.  Amdocs' Motion for Partial Summary Judgment of No Invalidity Based on
     Anticipation...................................................................................................................20
     A.    Legal Standards for Summary Judgment and Invalidation by Anticipation..........20
     B.    Statement of Undisputed Material Facts...............................................................22
     C.    The XaCCT 3.0 Product is Not Prior Art to the '065 Patent and Thus Does Not
           Anticipate As A Matter Of Law...........................................................................24
     D.    U.S. Patent Nos. 5,712,908; 5,732,128; and 5,784,443 Do Not Anticipate Claims
           1, 4, and 7 of the '065 Patent As A Matter Of Law ..............................................26
     E.    U.S. Patent Nos. 6,085,243; 5,787,253; and 5,958,010 Do Not Anticipate The
           Asserted Claims Of The '510 And '984 Patents As A Matter Of Law .................27

V.    Amdocs is Entitled to Summary Judgment of No Inequitable Conduct...........................29

VI.   Conclusion ...................................................................................................................30

## Table of Authorities

## CASES

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249 (Fed. Cir. 2010)..........28

*C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340 (Fed. Cir. 1998) ..........................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................................20, 29

*Cray Communications Inc. v. Novatel Computer Systems, Inc.*,
   33 F.3d 390 (4th Cir. 1994) ........................................................................................20

*Group One, Ltd. v. Hallmark Cards*, 254 F.3d 1041 (Fed. Cir. 2001) ..........................................25

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)........................21, 26

*Linear Technology Corp. v. Micrel, Inc.*, 275 F.3d 1040 (Fed. Cir. 2001) ...................................25

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995),
   *aff'd*, 517 U.S. 370 (1996)..........................................................................................10

*Matsushita Electric Industrial Co., Ltd.,v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................21

*National Presto Industries., Inc. v. West Bend, Co.*, 76 F.3d 1185 (Fed. Cir. 1996) ...................21

*Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359 (Fed. Cir. 2008) ..........................................21

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...................................................10, 11, 15

*Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 89 U.S.P.Q.2d 1370 (Fed. Cir. 2008)............21

*Texas Instruments Inc. v. U.S. International Trade Commission*, 988 F.2d 1165
   (Fed. Cir. 1993)...........................................................................................................13

*Therasense, Inc. v. Becton, Dickinson & Co.*, Nos. 2008-1511, -1512, -1513, -1514, -
   1595, (Fed. Cir. May 25, 2011) (*en banc*). .....................................................29, 30

*Trintec Industries, Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292 (Fed. Cir. 2002) ............................21

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996).........................................10

**STATUTES**

Fed. R. Civ. P. 56(a) ...................................................................................................1

Fed. R. Civ. P. 56(c) .................................................................................................21

35 U.S.C. § 102.....................................................................................................25, 26

35 U.S.C. § 119...........................................................................................................24

**I.    Introduction**

Plaintiff Amdocs respectfully moves for an order construing seven claim terms of the four Amdocs patents-in-suit, and also moves pursuant to Fed. R. Civ. P. 56(a) for partial summary judgment of no invalidity and no inequitable conduct.

In its Amended Complaint, Amdocs asserts that Openet, through the use, importation, sale and offer for sale of its products, infringes four Amdocs patents relating to network accounting and billing software.  (Amended Complaint (Dkt. 50).)  Openet has asserted non-infringement, invalidity, and unenforceability defenses against each of the patents-in-suit.  (Openet Answer to Amended Complaint (Dkt. 55-56).)  In order to narrow the disputes to be resolved, the parties have agreed that Amdocs may assert no more than five claims per patent at trial, and Openet may assert no more than five "primary prior art references" per patent.  A chart listing the asserted claims of the patents-in-suit, along with the alleged primary prior art references, is attached hereto as Appendix 1.

The parties have further negotiated to narrow the number of claim terms for construction, though they have not been able to agree on all terms.  Amdocs accordingly moves for construction of seven terms that are still in dispute.  Amdocs explains below that its proposed constructions should be adopted because they stay true to the claim language and most naturally align with the specifications of the patents.

Amdocs further moves for summary judgment of no invalidity based on anticipation respecting several of the "primary prior art references" relied upon by Openet.  As explained below, these references either do not constitute prior art to the asserted claims, or cover older technologies that do not disclose critical claim limitations.  Accordingly, because Openet has failed to set forth any evidence demonstrating that these references disclose each and every

limitation of the claims, summary judgment of no anticipation is warranted.  Finally, Amdocs

moves for summary judgment of no inequitable conduct because Openet has adduced no

evidence of any intent by any Amdocs responsible person to deceive the United States Patent and

Trademark Office ("USPTO").

## II.      Background of the Technology and the Patents-in-Suit

### 1.      The Parties

Plaintiff Amdocs (Israel) Limited, the assignee and owner of the patents-in-suit, is an

Israeli corporation and a subsidiary of Amdocs Limited (NYSE: DOX).  Amdocs serves

customers in more than 50 countries, including top-tier telecommunications providers AT&T,

Sprint, T-Mobile, Bell Canada, BT Group, Telus, Vodaphone, and others.  Amdocs' product

offerings include the CES (Customer Experience Systems) portfolio of software products that

enable service providers to track, account for, and bill for usage of network services such as

Internet, email, SMS messaging, etc.  Included among the CES portfolio are Amdocs'

"mediation" products that enable network carriers to collect and process information relating to

usage of networks.  Amdocs' mediation products and the patents-in-suit originate from the

development of mediation software products by a company called XaCCT Technologies, Inc.

("XaCCT").  XaCCT was formed in 1997 and was acquired by Amdocs in 2004.

Defendant Openet designs and sells software products, called FusionWorks, to

telecommunications companies including AT&T, Sprint, Verizon, Time Warner Cable, and

Cricket Communications.  The accused FusionWorks products are built on what Openet calls the

"Openet Framework" platform, and include the following products: FusionWorks Convergent

Mediation; FusionWorks Convergent Charging; FusionWorks Network Edge Rating;

FusionWorks Balance Manager; FusionWorks Policy Manager.  With limited exceptions,

Amdocs accuses Openet of infringement based on the offer for sale, sale, importation, and use of

the Openet core Framework software.  Because all of Openet's products are based on the

Framework platform, all of Openet's products are accused products in this case.

    2.    <u>Amdocs' Patents-in-Suit</u>

    The patents-in-suit stem from development of mediation products at XaCCT in the 1997

time-frame, and relate generally to mediating accounting and billing records for services

provided in networks that provide Internet services (*e.g.,* 3G and 4G networks).

    a)    Background of the Technology and the Nature of the Problem to Be Solved

    i)    Traditional Telephone Communications Systems

    Since at least the implementation of the telephone and telegraph, people have been able

to communicate over long distances using a network, so long as there is an infrastructure to

support communications and a service provider to provide services.  This requirement has led to

the creation of new companies, and indeed industries, to provide the infrastructure to support

these services.  For example, AT&T was the "carrier" that developed the initial infrastructure

required to enable telephone communications.  (*See* Zegura Decl. ¶ 5).

    Telephone carriers such as AT&T did not provide their services for free.  Further, they

needed insight into the usage of their network to provide the proper infrastructure and deliver

services efficiently.  Accordingly, carriers developed a way to track a customer's usage of the

network so that services could be delivered and the customer could be billed.  (*Id.* at ¶ 6).  Over

time, a system was developed for telephony networks that captured each customer's usage in a

digital record called a "Call Detail Record" ("CDR").  In practice, a CDR was created for each

telephone call placed by a customer, and information such as the called party's telephone

number, the calling party's telephone number, and the duration of the call were stored in CDRs.

These CDRs would be collected and sent to a central location in batches where they would be

processed later to create a bill for customers.  (*Id.*)

The traditional telephony CDR billing process was relatively simple.  In particular, traditional telephone networks were "circuit-switched networks" where a dedicated communications channel called a "circuit" was set up between two land-line phones with fixed identifiers (i.e., the telephone numbers).  The "circuit" would remain connected for the duration of the telephone call, and the call would be billed based on the duration, i.e., time from circuit-on (initial placement of the call) to circuit-off (end of call).  An exemplary circuit-switched network is shown below:



(*See* Zegura Decl. ¶ 7.)

### ii)      The Internet

The advent of the Internet in the 1990s offered a new type of network to allow users to communicate.  Unlike traditional "circuit-switched" telephony networks, however, the Internet is a "packet-based" network, and tracking usage on packet-based networks is vastly more complicated than circuit-switched networks.  (*See* Zegura Decl. ¶¶ 12-16; Ex. A[1], '065 patent, at 1:62-2:11).  In a packet-based network, no fixed path is used for data transfer, nor do users

---

[1] All cites to Exhibits refer to exhibits to the 5/26/2011 Declaration of Gregory H. Lantier in Support of Plaintiff Amdocs (Israel) Limited's Motion for Proposed Claim Constructions and Partial Summary Judgment of No Invalidity and No Inequitable Conduct.

always have a fixed identifier that uniquely identifies them.  Instead, each end system is assigned

an Internet Protocol ("IP") address, which may be temporary, and data is segmented into smaller

parts which are transmitted as "packets," and sent over the network.  The packets can be routed,

combined or fragmented, in the same or different paths, as required to get them to their eventual

destination.  On the receiving end, the process is reversed – the data is read from the packets and

re-assembled into the form of the original data.  An exemplary packet-based network is shown

below.



(*Id.*).

      In a packet-based network, no circuit is set up prior to sending data between devices.

Blocks of data, even from the same file or communication, may take any number of paths as they

journey from one end to the other.  (Zegura Decl. ¶ 13.)  Further, packet-based networks such as

the Internet typically employ a layered concept of networking to manage complexity and

accommodate changes in technology.  Layering is a way of sub-dividing the communications

task into smaller parts, each with a defined functionality.  (*See* Zegura Decl. ¶ 16).

      Initially, Internet Service Providers ("ISPs") and Network Service Providers ("NSPs")

billed users a flat rate for their Internet "dial-up" connectivity.  However, that circuit-switched

model soon became outdated given the packet-based nature of the Internet, and as Internet usage

exploded and users were provided new and different means (e.g., WiFi, cell-networks, Broadband, etc.) to connect.  (*See* Zegura Decl. ¶ 10-11).  Accordingly, by 1997, when Amdocs' predecessor company XaCCT was formed and the inventions contained in the patents-in-suit were conceived, developing new ways of tracking Internet transactions in order to account and bill for usage had become a paramount concern for network carriers and other Internet providers. (*Id.*; *see also* Ex. A, '065 Patent: 2:11-12 ("Therefore, what is desired is a system that allows for accounting and billing of transactions on [IP] based networks.").

> b)   The '065 Patent

U.S. Patent No. 7,631,065 issued from an application filed on December 7, 2001 as a continuation of U.S. Patent Application No. 09/442,876 (which later issued as U.S. Patent No. 6,418,467), which was in turn based on provisional applications filed on November 20, 1997 and November 19, 1998.  (Ex. A, '065 Patent.)  The claims of the '065 patent initially issued as claims in another patent applied for and obtained by Nortel Corporation (Ex. M, U.S. Patent No. 6,405,251).  After the Nortel patent issued, Amdocs amended the claims of the '065 application and instigated an interference with Nortel in the USPTO to determine who had priority to the overlapping claims of Nortel's patent and Amdocs' '065 application.  After Amdocs presented evidence of its prior invention, Nortel conceded that Amdocs had been first to invent what was claimed and that Amdocs had priority over Nortel.  As a result, Nortel's patent was rescinded and, after further consideration by the USPTO, the '065 patent was subsequently allowed and issued to Amdocs.  (*See* Ex. J, Excerpts from '065 Patent File History at AMDOCS0968596-637, and AMDOCS0968790-803; Ex. A, '065 patent. )

The '065 patent describes a system for collecting and processing network-related information in a packet-based network such as the Internet.  Account records may be generated from the information collected and sent on for downstream uses such as billing.  In addition,

information may be accumulated in a central database for creating auditing, accounting and

billing reports.  In one embodiment, a system is provided that includes a multi-source, multi-

layer network usage metering and mediation solution that provides records for billing and

accounting and that gives Internet providers the information to set the right-price for Internet

services.  Fig. 1, reproduced below, illustrates this embodiment.



**FIG. 1**

Figure 1 of the '065 patent depicts a number of Network Devices (Firewall 103, DNS

102, Proxy 101, LDAP 106, Radius 105, etc.), which represent any device in a network that

could provide information about network usage.  Figure 1 further includes Information Source

Modules ("ISMs") (110, 120, 130, 136, 140, 150) and Gatherers (161-165).  ISMs are coupled to

a specific Network Device and act as an interface between the Network Device and the

Gatherers.  Gatherers are hardware and/or software that gather network information from one or

more network devices via the ISMs, process that information, and send the processed

information on to the Central Event Manager ("CEM") (170).  The CEM acts as the central

nervous system of the system, providing centralized, efficient management and controls of the

gatherers and the ISMs.  Figure 1 also shows a Central Database (175) that is the central

repository of the information collected by the system, as well as a User Interface Server ("UIS")

(185) which allows multiple clients (e.g., terminals (180)) to access the system.

Figures 2 through 5 of the '065 patent, and the accompanying text of the '065 patent

specification, describe processing performed on information collected from Network Entities,

including filtering, aggregation, enhancement, merging, generation of billing records, etc.  In

packet-switched networks, typically data collected from a single source does not contain all the

information needed for billing and accounting.  "Enhancement" is thus performed to combine

Internet session data from multiple sources in order to derive useful reporting information or

generate a meaningful billing record.  The '065 patent devotes several columns to data

enhancement (*see* Columns 10-14), explaining in detail how information collected from different

sources may be stored, compared, modified, and combined.

Amdocs is asserting independent claims 1, 7 and 13, as well as dependent claims 4 and

17 of the '065 patent.  Representative claim 1 of the '065 patent is provided below, with the

terms to be construed underlined:

1. A computer program product embodied on a computer readable storage medium for
processing network accounting information comprising:
    computer code for receiving from a first source a first network accounting record;
    computer code for correlating the first network accounting record with accounting
information available from a second source; and
    computer code for using the accounting information with which the first network
accounting record is correlated to enhance the first network accounting record.

c)      The '984 and '510 Patents

U.S. Patent Nos. 6,947,984 (the "'984 patent") (Ex. D) and 7,412,510 (the "'510 patent")

(Ex. C) are both closely related to the '065 patent and share the same specification and lineage

back to 1997.  Amdocs is asserting claims 1, 2, 6, 8, and 13 of the '984 patent, and claims 16, 17,

and 19 of the '510 patent.  Both the '984 and '510 patents claim accounting and record

generating systems with reporting on network usage information from multiple network devices.

Representative claim 16 of the '510 patent is provided below, with the terms to be construed

underlined.

> 16. A computer program product stored in a computer readable medium for reporting on a collection of network usage information from a plurality of network devices, comprising:
>
> computer code for collecting network communications usage information in real-time from a plurality of network devices at a <u>plurality of layers</u>;
>
> computer code for <u>filtering</u> and <u>aggregating</u> the network communications usage information;
>
> computer code for completing a plurality of data <u>records</u> from the filtered and aggregated network communications usage information, the plurality of data <u>records</u> corresponding to network usage by a plurality of users;
>
> computer code for storing the plurality of data <u>records</u> in a database;
>
> computer code for submitting queries to the database utilizing predetermined <u>reports</u> for retrieving information on the collection of the network usage information from the network devices; and
>
> computer code for outputting a <u>report</u> based on the queries; wherein resource consumption queries are submitted to the database utilizing the <u>reports</u> for retrieving information on resource consumption in a network; and wherein a resource consumption <u>report</u> is outputted based on the resource consumption queries.

### d)      The '797 Patent

U.S. Patent No. 6,836,797 issued from an application filed on October 23, 2001 as a

continuation-in-part of an earlier application filed on November 18, 1999 and a provisional

application filed on October 23, 2000.  Ex. B, '797 patent.  Amdocs is asserting claims 1, 2, 7, 8,

and 19 of the '797 patent.  The '797 patents claims, among other things, the additional concept of

generating single records for a "plurality of services carried out over a network."[2]

## III.    Amdocs' Proposed Claim Constructions

Amdocs respectfully moves this Court to construe the following seven claim limitations

---

[2] Other than with respect to the construction of the term "record" (a term found in each of the patents-in-suit), the '797 claims are not at issue in this motion.

from the patents-in-suit: "record," "network accounting record," "first source/second source," "report," "plurality of layers," "filtering," and "aggregating."

The district court has the "power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  As a starting point, a claim term is to be given the "ordinary and customary meaning" it would have had to a person of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).  To determine that meaning, the court must first look to how the words of the claims themselves define the scope of the patented invention, and then look to "those sources available to the public that show what a person of skill in the art would have understood [the] disputed claim language to mean."  *Id.* at 1314 (citation omitted); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).  The specification "is the single best guide to the meaning of a disputed term."  *Phillips*, 415 F.3d at 1315.  Ultimately, a construction "can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim," and "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Phillips*, 415 F.3d at 1316.

A.     "Record" ('065 Patent: Claims 1, 4, 7, 13, 17; '797 Patent: Claims 1, 2, 7, 8, 19; '510 Patent: Claim 16; '984 Patent: Claims 1, 13)

| Amdocs's Proposed Construction | Openet's Proposed Construction |
|---|---|
| one or more fields of data treated as a unit | an ordered set of fields representing separate data items |

Each of the asserted claims of the patents-in-suit requires the receipt, generation, and/or storage of "records."  The '065 patent claims require the receipt and processing of "network accounting records" (Amdocs seeks a separate construction for that term in Section III(B)

- 10 -

below).  The '797 patent claims require the generation of a "single record" from data that has been collected describing a plurality of services on a network.  The '510 and '984 patent claims require the completion of "data records" from filtered and aggregated network usage information, and storage of those records in a database.

Amdocs and Openet agree that "records" should be defined to require "fields" of data, i.e., predetermined sections that contain information.  Amdocs' proposed construction, unlike Openet's, requires that those fields of data must be "treated as a unit" in order to be a record.  Amdocs' construction is proper because it comports with: (i) the understanding a person of ordinary skill would have for this commonly-used term, (ii) the claims of the patents-in-suit, and (iii) the specifications of the patents-in-suit.  Openet's proposed construction, on the other hand, does not require that the fields be "treated as a unit," and is thus overly broad.

The plain and ordinary meaning of "record" may be gleaned from dictionary definitions. *See, e.g.*, Ex. S, *Microsoft Computer Dictionary*, 4th Ed., 1999, at 376 ("[a] data structure that is a collection of fields (elements), each with its own name and type"); Ex. T, *Merriam-Webster's Ninth New Collegiate Dictionary*, 1988, at 984 ("a collection of related items of information (as in a data base) treated as a unit")).  These dictionaries therefore confirm that records are structured units of meaningful data.  (*See also* Zegura Decl. ¶ 36; *Phillips,* 415 F.3d at 1318 (dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology, [and] have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention") (citation omitted).)

The claims of the patents-in-suit further demonstrate that a "record" requires a set of fields that are "treated as a unit."  The claimed "records" in the '065, '797, '510, and '984

patents are all generated based on the collection of information relating to the use of a network by end-users. The "records" in the patents-in-suit are thus coherent sets of fields relating to one or more specific transactions on a network – it follows that "records" should be construed to require an ordered set of fields treated as a unit.

The specifications of the patents-in-suit further support Amdocs' proposed construction. At a high-level, the patents-in-suit relate to the generation of meaningful accounting and billing information from incomplete data elements available on a network. This process results in the formation of "records" that a person of ordinary skill in the art would readily understand would be used billing and accounting purposes. For instance, as described in the patents, "[t]he system transforms raw transaction data from network devices into useful billing *records* though policy-based filtering, aggregation, and merging." ('Ex. A, 065 Patent at col. 3:40-42 (emphasis added); ; *see also id.* Col. 4:4-8; 7:13-21; 7:51-61). Thus, according to the patents-in-suit, network data is made useful by being transformed into records. These records are used for billing purposes, and also enable service providers to "deploy new services based on documented usage trends, plan network resource provisioning, and audit service usage." (Ex. A, '065 patent, Col. 3:49-51). A person of ordinary skill in the art would thus understand that "records" as used in the billing and accounting context of the patents-in-suit are one or more fields of data treated as a unit.

As noted above, Openet and Amdocs agree that "records" require fields of data. Openet's construction, however, does not require that the fields be "treated as a unit." Instead, Openet apparently takes the broader view that *any* set of fields constitutes a "record." Indeed, Openet's expert, Dr. McDaniel, testified that under Openet's construction a record is essentially *anything* that is put into a database. (*See* Ex. W, McDaniel Dep. Tr. 210:7-8 ("Well, if you have

a database, then you have records.")).  However, this broad construction is not supported by the

patents-in-suit, and in fact runs contrary to the language of the claims.  For example, the asserted

claims of both the '510 and '984 patents require "completing a plurality of data records," *as well*

*as* "storing the plurality of data records in a database."  To construe "record" as broadly as *any*

data that is stored in a database would improperly obviate the limitation of these two patents

requiring "storing the plurality of records in a database."  *See Texas Instruments Inc. v. U.S. Int'l*

*Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[T]o construe the claims in the manner

suggested by [the plaintiff] would read an express limitation out of the claims.  This we will not

do.").

### B.      "Network Accounting Record" ('065 Patent: Claims 1, 4, 7)

| Amdocs's Proposed Construction | Openet's Proposed Construction |
|---|---|
| a record reflecting one or more transactions on an IP and/or packet-based network | a record that accounts for network usage |

The parties are close in their proposed constructions for "network accounting record" in

that they agree that the term should be construed to require records that account for (i.e., reflect)

network usage (i.e., transactions on a network).  Openet's proposed construction is broader than

Amdocs', however, in that Openet does not limit the type of network involved, whereas

Amdocs' construction would require the networks to be "IP and/or packet-based" networks.

Amdocs' proposed construction should be adopted because its construction, not Openet's,

faithfully adheres to the claims, the description of the invention, and indeed the entire thrust of

the '065 patent. [3]

First, the claims of the '065 patent admittedly do not explicitly require that the "network

---

[3] For the same reasons that "network accounting records" should be construed to require "IP and/or packet-based networks," the term "network entity" in '065 patent, claim 13 should be construed to require that the entity be a source of data on an IP and/or packet-based network.

accounting records" be "IP and/or packet-based."  However, the claims do require that the

network accounting record from a first source be "enhanced" using network accounting data

available from a second source.  A person of ordinary skill in the art reading these claims would

readily understand that the act of "enhancement" is necessary in IP and/or packet-based networks

(as opposed to other networks such as circuit-switched telephony networks) because the initial

records that may be obtained from the system are incomplete.  (Zegura Decl. ¶¶ 12-16; Ex. A,

'065 Patent, Col. 7:51-54 ("Typically, data collected from a single source does not contain all the

information needed for billing and accounting….")).  Accordingly, because the claims

specifically require the enhancement of "network data records," a person of ordinary skill in the

art would understand that those records come from an IP and/or packet-based network.

Second, the specification repeatedly confirms that the inventors intended their claims to

cover IP and/or packet-based networks.  For example, the Field of the Invention section notes

that "the invention relates to accounting and billing for services in a *computer network*."  Ex. A,

'065, Col. 1:31-33 (emphasis added).  The Background of the Invention goes on to describe the

differences between IP networks, which are packet-based and extremely complex, and the older

circuit-switched voice-networks:

> The low cost of Internet connectivity and a wide range of services are
> driving more [] people onto the Internet, which is driving the deployment
> of TCP/IP networks….Due to the diversity of IP data sources (e.g.,
> routers, hubs, etc.), the need for effect tracking far exceeds the problems
> addressed by telephone companies….Therefore, what is desired is a
> system that allows for accounting and billing of transactions on EP [sic –
> IP] based networks.

(*Id.* at 1:35-2:12.)

Further, all of the embodiments disclosed in the Summary of the Invention and Detailed

Description sections of the '065 patent disclose IP and/or packet-based networks.  Indeed, with

one exception, the bulk of the specification describes the invention in terms of a preferred

embodiment for IP networks.  At one point, the specification does note that the invention may be

applicable to "non-IP networks….What is important is that some sort of processing and storing

capability is available at the gatherers, the CEMs, the databases and the user interface servers."

('065 Patent, Col. 15:18-27).  Even if the network is not an IP network, however, a person of

ordinary skill in the art would recognize that gatherers, CEMs, databases and user interface

servers of the type described would be applicable to packet-based networks like IP networks.

Accordingly, a person of ordinary skill in the art would understand "network accounting records"

are not records for *any* type of network, but instead reflect transactions on an IP and/or packet-

based network.

C.      "First Source" and "Second Source" ('065 Patent: Claims 1, 7)

| Amdocs's Proposed Construction | Openet's Proposed Construction |
|---|---|
| first source: a source of network information second source: a source of network information of a different type than the information from the first source | two distinct sources, located in different locations of a network, of network accounting information |

Claims 1 and 7 both require the receipt of a network accounting record from a "first

source," and using accounting information from a "second source" to enhance the first network

accounting record.  Both Amdocs and Openet agree that the "first source" and "second source"

must be distinct.  The point of disagreement is whether the first and second sources are distinct

by virtue of being of a different type (as Amdocs contends) or from a different location (as

Openet contends).  The Court should adopt Amdocs' proposed construction, as opposed to

Openet's, because it is supported by the claims themselves, and is consistent with the description

of the invention in the specification.  *See Phillips*, 415 F.3d at 1316 ("[t]he construction that

stays true to the claim language and most naturally aligns with the patent's description of the

invention will be, in the end, the correct construction.").

The claims of the '065 patent themselves support Amdocs' proposed construction.  Both claims 1 and 7 require that the accounting information from the second source be used to "enhance" the record received from the first source.  (Ex. A, '065 patent, claim 1, 7.)  A person of ordinary skill in the art reading these claims would understand that incomplete billing records obtained from a first source may be enhanced with different *types* of information available from a second source.  (Zegura Dec. ¶ 41-43.)  Accordingly, the claims indicate that the data from the second source enhances the network accounting record from the first source with additional types of information.

The '065 specification further supports Amdocs' proposed construction.  For example, the specification notes that "different *types* of sources can provide different *types* of information."  (Ex. A, '065 Patent, Col. 2:39-40 (emphasis added).)  Further, the specification explicitly lists potential sources of information by type, not by location: "Potential sources of information include packet use from routers, firewall authentication logging, email data, ISP session logging, and application layer use information."  (*Id.* at 2:16-18.)  Packet use data, firewall and ISP logging data, email data, and application layer data are types of data, not locations.  A person of ordinary skill in the art reading the claims of the '065 patent in light of the specification would thus understand that a first and second source of data would provide different *types* of data.  (*Id.*, *see also* Zegura Decl. ¶ 41-43.)

Amdocs' proposed construction is further supported by U.S. Patent No. 6,405,251, which is the Nortel patent which initially issued with the claims now found in the '065 patent (Nortel conceded priority after Amdocs provoked an Interference proceeding before the  USPTO and the '065 patent subsequently issued to Amdocs).  The specification of the '251 patent notes that

network devices "can produce data of various types and formats" (Ex. M, '251 patent, col. 2:49-51), and then, like the '065 patent, lists various sources by type: "Information sources can include network traffic flow, RADIUS accounting data, RMON/RMON2 data, SNMP-based data, and other sources of network usage data." *Id.* at col. 3:7-10.  This passage independently confirms that a "second source" of information must be of a different type than the "first source" as those terms are used in the '065 patent claims.

Openet's proposed construction for these terms, "two distinct sources, located in different locations of a network, of network accounting information," is improper because it simply differentiates sources by location, not by type of data retrieved.  Thus, according to Openet's construction, a first source and a second source may supply *identical* information and still be covered by the claims of the '065 patent.  Indeed, Openet's expert Dr. Shamos admitted that under Openet's construction, two computers sitting on a desk six inches apart and supplying identical records would be a first source and a second source.  (Ex. V, Shamos Dep., 320:15-323:5).  Neither Openet, nor Dr. Shamos, explains how a record from such a purported "second source" could be used to enhance an identical record obtained from a "first source.  Nor have Openet and Dr. Shamos explained how Openet's proposed construction comports with the use of the term "source" in the '065 specification and claims.

### D.     "Report" ('510 patent: Claims 16, 17; '984 patent: Claims 1, 2, 13)

| Amdocs's Proposed Construction | Openet's Proposed Construction |
| --- | --- |
| a query to a database and/or the result of such a query | Plain and ordinary meaning |

Openet has not proposed a construction for "report," but instead asserts that the term should be given its plain and ordinary meaning.  While the term is not an overly complicated one, Amdocs does believe a construction is warranted given the particular way the term is used

in the '510 and '984 patent claims.  For example, claim 13 of the '984 patent requires "allowing the selection of one of a plurality of reports," "submitting queries to the database utilizing the selected reports," and "outputting a report."  In other words, in this claim, "reports" are used to query a database, and are also the outputs of such queries.  Similarly, claim 16 of the '510 patent requires submitting queries to a database utilizing "predetermined reports," as well as "outputting a report based on the queries."  Accordingly, Amdocs believes that the jury will benefit from a construction for "report" that takes into account the fact that the term is used in the claims to describe both queries to a database and the result of such queries.  Given that the claims explicitly note that the report is the query or the result of the query, a person of ordinary skill in the art is would not be confused by the usage of that term in the claims.  A jury, on the other hand, will benefit from a construction for "report."

**E.      "plurality of layers" ('510 patent: Claim 16; '984 patent: Claims 1, 13)**

| Amdocs' Proposed Construction | Openet's Proposed Construction |
|---|---|
| More than one layer of the OSI network model | Multiple levels in a network |

The proper construction for "plurality of layers" is "more than one layer of the OSI network model."  In the claims, the "plurality of layers" contain a plurality of "network devices." (*See, e.g.,* Ex. C, '510 Patent, Claim 1).  Network devices clearly exist on a network, therefore the plurality of layers are more than one layer on a network.  As described above with respect to the term "network accounting record," the claimed networks of the patents-in-suit are IP and/or packet-based networks, which employ an OSI model.  (*See* Zegura Decl. ¶¶ 17-24 for a discussion of the OSI network model).  The specification further confirms that the claimed "plurality of layers" refers to network layers of the OSI network model.  (*See, e.g.*, Ex. C, '510 patent, 2:23-25 ("Therefore, what is desired is a system and method that track IP network usage

information across multiple layers of the OSI network model."); *id.* 4:3-5 ("Data collection can

be from a wide range of network devices and services, spanning all layers of the network – from

the physical layer to the application layer.")).

   **F.**  **"Filtering" ('510 patent: Claim 16; '984 patent: Claim 1, 13)**

| Amdocs's Proposed Construction | Openet's Proposed Construction |
|---|---|
| Discarding unneeded information | Processing or discarding information. |

   The common specification of the '510 and '984 patents confirms the plain meaning of

"filtering" as discarding unneeded information.  (*See, e.g.*, Ex. C, '510 patent, 7:18-21 ("Filtering

means discarding any record that belongs to a group of unneeded data records. Data records are

unneeded if they are known to be collected elsewhere. A policy framework enables the NSP to

configure what to collect where.").  Openet's proposed construction would define filtering to

include "processing" information, but not all processing is filtering.  Instead, only processing that

*discards* information is filtering.  Accordingly, the Court should construe "filtering" to mean

"discarding unneeded information."

   **G.**  **"Aggregating" ('510 patent: Claim 16; '984 patent: Claim 1, 13);**
     **"Aggregation" ('065 patent: Claim 17)**

| Amdocs's Proposed Construction | Openet's Proposed Construction |
|---|---|
| Accumulating/Accumulation | This claim term is indefinite. To the extent it is amenable to construction, it refers to accumulating groups of data record flows and generating a single data record for each group. |

   The term "aggregating" is commonly understood to mean "accumulating" i.e., collecting

into a mass or whole.  (*See, e.g.*, Ex. T, *Merriam-Webster's Ninth New Collegiate Dictionary*,

1988, at 64 (aggregation: "the collecting of units or parts into a mass or whole")).  It is further

clear what the term means in the context of the asserted claims.  For example, the term appears in

- 19 -

the body of claim 17 of the '065 patent ("the module receives the records produced by the plurality of data collectors for aggregation purposes").  The term in this context refers to the accumulation of records.  Openet's proposed construction is overly limited because it is limited to a single embodiment of the specification.  *See* Ex. C, '510 patent, Col. 7:14-17.

## IV.    Amdocs' Motion for Partial Summary Judgment of No Invalidity Based on Anticipation

Amdocs' motion for partial summary judgment of no invalidity based on anticipation contains three main arguments: (i) the XaCCT 3.0 product relied upon by Openet to invalidate the asserted claims of the '065 patent is not in fact prior art to that patent and thus cannot anticipate under 35 U.S.C. § 102; (ii) three patents relied upon by Openet do not anticipate claims 1, 4, or 7 of the '065 patent because they do not disclose either the collection of "network accounting records," or the collection of data from both a "first source" and a "second source"; and (iii) three patents relied upon by Openet do not anticipate the asserted claims of the '510 and '984 patents because they do not disclose the "completion of a plurality of data records."  While granting Amdocs' motion for partial summary judgment will not completely dispose of all the invalidity issues in this case (e.g., Openet has asserted obviousness of the '797 patent based on combinations of art), it would considerably narrow the number of issues to be resolved at trial.

### A.        Legal Standards for Summary Judgment and Invalidation by Anticipation

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  If a nonmoving party bears the burden of proof on a claim at trial, the moving party may prevail on its Rule 56 motion by showing that there is a lack of evidence to carry the other party's burden as to any essential element of the cause of action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Cray Commc'ns Inc. v. Novatel*

*Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994).  Once the moving party has met its burden of demonstrating the absence of an issue of material fact, the party opposing summary judgment may not rest on mere allegations or inferences, but must instead proffer specific facts or objective evidence showing that a genuine issue of material fact exists requiring further proceedings. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To meet the requirements of patentability, an alleged invention must be new.  *See C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1349 (Fed. Cir. 1998).  A patent will only be declared invalid due to anticipation if "each and every limitation" of the patent is found "either expressly or inherently in a single prior art reference." *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1381 (Fed. Cir. 2005) (citation omitted).  Inherent anticipation requires that the missing descriptive material is "necessarily present," not merely probably or possibly present, in the prior art. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) (citation omitted).

The prior art reference must disclose all of the claim elements arranged or combined in the same way as recited in the challenged patent. *See NetMoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  Moreover, the prior art reference must "clearly and unequivocally disclose the claimed [invention]…without *any* need for picking, choosing, and combining various disclosures not directly related to each other by the teachings of the cited reference." *Sanofi-Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1083 (Fed. Cir. 2008) (emphasis in original) (citation omitted).  Finally, issued patents are entitled to a presumption of validity by virtue of their approval by the USPTO, and a challenger thus bears a heavy burden of proving invalidity by clear and convincing evidence. *See Nat'l Presto Indus., Inc. v. West Bend, Co.*, 76 F.3d 1185, 1188 (Fed. Cir. 1996).

**B.      Statement of Undisputed Material Facts**

1.      U.S. Patent 7,631,065 claims priority to Provisional Application No. 60/066,898. (Ex. A, '065 patent, cover, col. 1:13-16.)

2.      Provisional Application No. 60/066,898 was filed on November 20, 1997.  (Ex. R, at AMDOCS0630535[4]).

3.      The disclosures of Provisional Application No. 60/066,898 support the asserted claims of the '065 patent.  (Zegura Decl. ¶¶ 57-58 and Appx B; Ex R, '898 Provisional App.)

4.      The XaCCT 3.0 product did not exist as a product in 1997.  (Ex. U, Givoly Dep. Tr. 147:11-148:3.)

5.      The XaCCT 3.0 product was publicly announced in December 1997.  (Ex. O, DTX 022.)

6.      The XaCCT 3.0 product was publicly demonstrated after February 1998.  (Ex. N, DTX 018; Ex. U, Givoly Tr. 276:18-278:5.)

7.      The XaCCT 3.0 product was first shipped no earlier than July 1998.  (Ex. P, DTX 151.)

8.      Openet and its expert Dr. Shamos rely on DTX 012 in their invalidity claim charts respecting XaCCT 3.0 and the '065 patent.  (Ex. X, Exhibit 3B to Shamos Rep., at 2-18; Ex. Q, DTX 012.)

9.      DTX 012 is dated June 1998. (Openet Exhibit List (Dkt. 82)).

10.      The XaCCT 3.0 product was designed and developed by the inventors of the '065 patent.  (*See* Ex. A, cover; Ex. R, '898 Provisional App.;  Ex. J, '065 File History Excerpts at AMDOCS0968589-91; Ex. U, Givoly Dep. Tr. 37:12-51:23, 253:17-254:5, 692:23-699:20.)

11.      The portions of U.S. Patent No. 5,712,908 (Ex. E) that Openet contends disclose

---

[4] A certified copy is PTX 9 (Dkt. 85).  A previously unproduced version is DTX 148 (Dkt. 82).

collecting "network accounting records from a first source" are: '908, Figure 3, Col. 10: 61-64, Figure 4, Col. 11:40-50.  (Ex. X, Shamos Rep. Exhibit 3B , at  21, 28).

12.     The portions of U.S. Patent No. 5,712,908 (Ex. E) that Openet contends disclose a "second source" of accounting information are: '908, Figure 4, Col. 11:61-12:13; Col. 16:56-63, Figure 8, Col. 17:47-58. (Ex. X, Shamos Rep. Exhibit 3B, at 22, 29).

13.     The portions of U.S. Patent No. 5,732,128 (Ex. F) that Openet contends disclose collecting "network accounting records from a first source" are: '128, Col. 3:65-4:1.  (Ex. X, Shamos Rep. Exhibit 3B, at 20, 28).

14.     The portions of U.S. Patent No. 5,732,128 (Ex. F) that Openet contends disclose a "second source" of accounting information are: '128, Col. 4:53-57; Col. 5:55-63].  (Ex. X, Shamos Rep. Exhibit 3B., at 22, 29).

15.     The portions of U.S. Patent No. 5,784,443 (Ex. G) that Openet contends disclose collecting "network accounting records from a first source" are: '443, Col. 2:50-58 .  (Ex. X, Shamos Rep. Exhibit 3B, at 20, 28).

16.     The portions of U.S. Patent No. 5,784,443 (Ex. G) that Openet contends disclose a "second source" of accounting information are: '443, Col. 3:56-59.  (Ex. X, Shamos Rep. Exhibit 3B, at 22, 29).  .

17.     The portions of U.S. Patent No. 6,085,243 (Ex. H) that Openet contends disclose "completing a plurality of data records" are: '243, Col. 6:13-14; Col. 9:38-42; Col. 12, l. 66-13:1. (Ex. Y, McDaniel Rep., Appx. A, at 72, 81; Ex. Z, McDaniel Rep. Appx. B, at 46.)

18.     The portions of U.S. Patent No. 5,787,253 (Ex. K) that Openet contends disclose "completing a plurality of data records" are: '253, Col. 10:46-50; Col. 10:53-55; Col. 12:46-59; Col. 9:50-52, Figure 5c .  (Ex. Z, McDaniel Rep., Appx. B, at 52-53.)

19.     The portions of U.S. Patent No. 5,958,010 (Ex. L) that Openet contends disclose "completing a plurality of data records" are: '010, Col. 6:23-27; Col. 6:46-65.  (Ex. Z, McDaniel Rep., Appx. B, at 60).

### C.     The XaCCT 3.0 Product is Not Prior Art to the '065 Patent and Thus Does Not Anticipate As A Matter Of Law

One of the primary references Openet contends anticipates the asserted claims of the '065 patent is the XaCCT 3.0 product.  (*See* Ex. X, Shamos Rep. Exhibit 3B, at 1-19).  XaCCT was the initial assignee of the application that resulted in the '065 patent (XaCCT was purchased by Amdocs in 2004 and the patent rights were transferred at that time), and the inventions claimed in the '065 patent were conceived during the development of the XaCCT 3.0 product.  The '065 patent claims priority to a provisional application filed on November 20, 1997, and Openet has not provided any evidence that the XaCCT 3.0 product was commercialized more than a year before that date, or that it otherwise qualifies as prior art under any part of 35 U.S.C. § 102.

The '065 patent claims priority to Provisional Application No. 60/066,898, filed on November 20, 1997.  (Ex. A, '065 patent col. 1:13-16.)  Further, the '065 patent is entitled to the November 20, 1997 effective filing date.  *See* 35 U.S.C. § 119.  Dr. Ellen Zegura, Plaintiff's expert, will testify that the '898 application supports all of the asserted claims of the '065 patent. (Zegura Decl. ¶¶ 57-58 & Appx. B; Ex. R, '898 Provisional App.)  Openet's experts provided no contrary opinion, nor has Openet provided any basis to argue that the '065 patent is not entitled to the priority date on the patent's face.  (*See, e.g.*, Ex. V, Shamos Dep. Tr. 171:7-172:9.) (declining to offer opinion as to whether XaCCT 3.0 is prior art to the '065 patent).

Openet has not clarified which section of 35 U.S.C. § 102 it is purportedly relying on for its anticipation argument for the XaCCT 3.0 product.  The most obvious candidate would be the "on sale bar" of Section 102(b), in which products may qualify as prior art if they were "on sale

in this country, more than one year prior to the date of the application for patent in the United

States." 35 U.S.C. § 102(b).  However, to qualify as prior art under the 102(b) "on sale bar,"

Openet must demonstrate that the XaCCT 3.0 product was offered for sale or sold prior to

November 20, 1996 (i.e., one year prior to the November 20, 1997 provisional application).  *See*

*Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1047 (Fed. Cir. 2001).  This Openet cannot

do.  Instead, the undisputed evidence demonstrates that XaCCT 3.0: (i) did not even exist as an

actual product in 1997 (Ex. U, Givoly Dep. Tr. 147:11-148:3); (ii) was publicly announced in

December 1997 (Ex. O, DTX 022, Dec. 3, 1997 Fall Internet World '97), (iii) was publicly

demonstrated after February 1998 (Ex. N, DTX 018, March 19, 1998 press release; Ex U, Givoly

Tr. 276:18-278:5), and (iv) first shipped in July 1998 (at the earliest)  (Ex. P, DTX 151, XaCCT-

at-a-Glance,).  Indeed, Openet and its expert rely in their invalidity claim charts on a single

XaCCT 3.0 document that is *by Openet's admission dated June 1998*.  (*See* Ex. X, Shamos Rep.

Exhibit 3B, at 2-18; Ex. Q, DTX 012; Openet Pretrial Exhibit List (Dkt. 82).)

Openet also fails to raise any genuine issue regarding anticipation by XaCCT 3.0 under §

102(a), in which a product may be prior art if it "was known or used by others in this

country…before the invention thereof by the applicant."  The evidence is undisputed that

XaCCT 3.0 was designed and developed by the inventors on the '065 patent – – XaCCT 3.0 was

thus not previously known or used by others.  (*See* Ex. A, cover; Ex. R, '898 Provisional App.;

Ex. J, '065 File History at AMDOCS0968589-91; Ex U, Givoly Dep. Tr. 37:12-51:23, 253:17-

254:5, 692:23-699:20.)

Because there are no other provisions of Section 102 that would qualify the XaCCT 3.0

product as prior art to the '065 patent, partial summary judgment of no anticipation should be

granted.  *See Linear Tech.*, 275 F.3d at 1047; *see also Group One, Ltd. v. Hallmark Cards*, 254

F.3d 1041, 1048 (Fed. Cir. 2001)

**D.     U.S. Patent Nos. 5,712,908; 5,732,128; and 5,784,443 Do Not Anticipate Claims 1, 4, and 7 of the '065 Patent As A Matter Of Law**

Claims 1, 4, and 7 of the '065 patent claim, among other things, the collection of "network accounting records" from a "first source," and the enhancement of those records with accounting information available from a "second source." As explained in detail above, a proper construction of "network accounting records" requires that those records be from an IP and/or packet-based network. (*See* Section III.B above.) Likewise, a proper construction of "first source/second source" requires that the two sources supply different types of data. (*See* Section III.C above.) Because three of the primary prior art references Openet relies upon – U.S. Patent Nos. 5,712,908; 5,732,128; and 5,784,443 – do not disclose either the collection of "network accounting records," or the collection of data from a "first source" and a "second source," these references do not anticipate as a matter of law.

Openet has not asserted that these prior art patents disclose either "network accounting records" or a "first source/second source" inherently – thus, the references must disclose the limitation expressly, or they do not anticipate. *See IPXL Holdings*, 430 F.3d at 1381 (anticipation requires that "each and every limitation" of the patent is found "either expressly or inherently in a single prior art reference."). Openet has not offered any evidence, however, that these references expressly disclose "network accounting records" or a "first source/second source." Indeed, these earlier patents relate to the collection of data from fundamentally different types of networks – i.e., the older circuit-switched telephony networks that were specifically distinguished in the Background of the Invention section of the '065 patent. (*See* Ex. A, '065 Patent, Col. 2:2-12 ("Typically, the phone company captures all of the data and uses batch processing to aggregate the information into specific user accounts….This requires a

significant amount of computing power.  However, this type of problem is significantly simpler than attempting to track and bill for every transaction in an IP-network.").)

The '908 patent, for example, describes the collection and generation of call billing records in a circuit-switched telephony network.  Such call billing records are not, however, "network accounting records," as that term is properly construed, because they do not reflect transactions on an IP and/or packet-based network.  Further, the '908 patent simply describes retrieving one type of record – i.e., the call billing records – and thus does not disclose retrieving network information from both a "first source" and a "second source."  Likewise, both the '128 and '443 patents disclose telephony circuit-switched systems in which information of only one type – i.e., call activity records – is retrieved.  (Zegura Decl. ¶¶ 59-69.)  Because Openet has not identified the disclosure of "network accounting records" or a "first source/second source" in any of the '908, '128, or '443 patents, summary judgment of no anticipation by these patents against claims 1, 4, and 7 of the '065 patent is warranted.

**E.      U.S. Patent Nos. 6,085,243; 5,787,253; and 5,958,010 Do Not Anticipate The Asserted Claims Of The '510 And '984 Patents As A Matter Of Law[5]**

Each of the asserted claims of the '510 and '984 patents requires "completing a plurality of data records" based on the collection of network usage information, *as well as* generating reports on the collection of network usage information.  In other words, the '510 and '984 claims require the generation of *both* "records" and "reports."  Because the '243, '253 and '010 patents disclose "monitoring" and "reporting" systems that generate reports, but not records, they do not anticipate the asserted claims of the '510 and '984 patents.

As detailed above, a "record" is properly construed as one or more fields of data treated

---

[5] Each of the '243, '253, and '010 patents is asserted by Openet as prior art against the '510 patent.  Of these three, only the '243 patent is asserted by Openet as prior art against the '984 patent.  Because the claim limitations of the '510 and '984 patents relied upon in this portion of the brief are identical, the patents will be treated together in this section.

as a unit.  (Section III.A).  As claimed in the '510 and '984 patents, "records" are "completed" based on filtered and aggregated network usage data.  A person of ordinary skill in the art would understand that such a record would ultimately be destined for downstream purposes such as preparing a bill for the user of the system.  (Ex. A, '065 Patent, Col. 3:40-42.).  A "report," on the other hand, is a query to a database and/or the result of such query.  (Section III.D).  Clearly, a "record" and a "report" are not the same thing.  *See Becton Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010) (A patent "must be interpreted with an eye toward giving effect to all terms in the claim.") (*citation omitted*).  Indeed, Openet's own expert Dr. Shamos testified that "record" and "report" are "orthogonal concepts," meaning that "they're separate.  The notion of a record has no impact on the understanding of report.  And understanding of 'report' has no impact on understanding of 'record.'"  (Ex. V, Shamos Dep., Tr. 77:16-79:1).  Accordingly, in order to demonstrate anticipation of the asserted claims of the '984 and '510 patents, Openet must demonstrate that the prior art it relies upon discloses *both* the generation of reports and records.

The system disclosed and claimed in the '510 and '984 patents is *both* a network accounting and billing system, as well as a monitoring system that provides reports on network usage.  However, the systems disclosed and claimed in the prior art '243, '253, and '010 patents are *monitoring* systems only, and therefore do not disclose the generation of records for downstream uses such as billing.  This is a fundamental difference between the prior art systems and the ones claimed in the '984 and '510 patents, and Openet and its experts are unable to identify where in these prior art patents is the disclosure of "completing a plurality of data records."  (See Ex. Y, McDaniel Rep., Appx. A at 81; Ex. Z, McDaniel Rep., Appx. B at 46, 52-53, 60; *see also* Zegura Decl. ¶¶ 70-75).

- 28 -

Thus, Openet has failed to make a showing sufficient to establish the existence of an element essential to its case, and on which it bears the burden of proof at trial.  Under *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), Amdocs is entitled to a judgment as a matter of law that the '243, '253, and '010 patents do not anticipate the asserted claims of the '510 patent, and that the '243 patent does not anticipate the asserted claims of the '984 patent.

## V.     Amdocs is Entitled to Summary Judgment of No Inequitable Conduct

Yesterday, the Federal Circuit, sitting *en banc*, issued an opinion in *Therasense, Inc. v. Becton, Dickinson and Co.*, which "tightens the standards for finding both intent and materiality in order to redirect a doctrine [the doctrine of inequitable conduct] that has been overused to the detriment of the public."  No. 2008-1511, -1512, -1513, -1514, -1595 (Fed. Cir. May 25, 2011), slip op. at 24.  Especially under these heighted standards of proof, Openet's inequitable conduct claim[6] cannot survive summary judgment because Openet lacks any adequate evidence of specific intent to deceive the Patent Office.[7]

To prevail on a claim of inequitable conduct, the accused infringer now must prove that the patentee acted with "specific intent to deceive the PTO."  *Id.* at 24.  "In other words, the accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and ***made a deliberate decision to withhold it***."  *Id.* (emphasis added).  Openet must meet its burden to prove that the inventors or the prosecuting attorney "acted knowingly and deliberately with the purpose of defrauding the PTO and the courts."  *Id.* at 25.  Examples of evidence of intent to deceive cited by the Federal Circuit in

---

[6] (Openet Telecom Inc. Defense 6, Counterclaims IX and X (Dkt. 55); Openet Telecom Ltd. Defense 6 (Dkt. 56).
[7] Amdocs believed it was entitled to summary judgment under the pre-*Therasense* inequitable conduct standard as well, given the absence of any evidence of intent to deceive. Amdocs also contests the materiality of the references cited by Openet.

*Therasense* involved bribery, perjury, and suppression of evidence.  *Id.*  "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive."  *Id.*  Further, "to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence.'"  *Id.* (citation omitted)  "Indeed, the evidence 'must be sufficient to **require** a finding of deceitful intent in light of all the circumstances.'"  *Id.* at 25-26 (citation omitted; emphasis in original).

Despite taking a total of six depositions of the three inventors of the patents-in-suit and a deposition of the attorney who prosecuted the patents, Openet lacks any evidence that could create a legitimate dispute of material fact as to the intent element of inequitable conduct. Openet does not even allege that there is any direct evidence of inequitable conduct, and has not developed any such direct evidence during discovery.  Openet alleges that intent can instead be "inferred" (Dkt. 51, ¶¶ 58-59, 71-73).  The facts as alleged, however, even if proven, would not support a finding of inequitable conduct under *Therasense*'s heightened standard for proving specific intent to deceive.

## VI.   Conclusion

For the foregoing reasons, Plaintiff's Motion for Proposed Claim Construction and Partial Summary Judgment of No Invalidity and No Inequitable Conduct should be granted.

Dated: May 26, 2011                              Respectfully submitted,


                                                 ____/s/_____
                                                 James L. Quarles III (Bar No. 44993)
                                                 Gregory H. Lantier (VSB No. 65657)
                                                 WILMER CUTLER PICKERING
                                                      HALE AND DORR LLP
                                                 1875 Pennsylvania Avenue NW
                                                 Washington, DC 20006
                                                 ph: (202) 663-6000

Fax: (202) 663-6363
james.quarles@wilmerhale.com
gregory.lantier@wilmerhale.com

Nels T. Lippert, *pro hac vice*
S. Calvin Walden, *pro hac vice*
WILMER CUTLER PICKERING
        HALE AND DORR LLP
399 Park Avenue
New York, NY 10022

**Appendix 1 – Patents-in-Suit, Asserted Claims, Primary References**

| Patent | Asserted Claims | Openet Primary Prior Art References |
|---|---|---|
| 7,631,065 | 1, 4, 7, 13, 17 | Xacct mediation system<br>U.S. Patent No. 5,712,908<br>U.S. Patent No. 5,732,128<br>U.S. Patent No. 5,784,443<br>The ITU-T M.3010 Specification |
| 6,947,984 | 1, 2, 6, 8, 13 | Concord Communications' Network Health Systems<br>Telemate Telemate.Net System<br>U.S. Patent No. 6,085,243<br>U.S. Patent No. 5,825,769<br>U.S. Patent No. 5,285,494 |
| 7,412,510 | 16, 17, 19 | Concord Communications' Network Health Systems<br>Telemate Telemate.Net System<br>U.S. Patent No. 6,085,243<br>U.S. Patent No. 5,787,253<br>U.S. Patent No. 5,958,010 |
| 6,836,797 | 1, 2, 7, 8, 19 | Xacct 3.0<br>Lucas et al, "Mediation in a Multi-Service IP Network"<br>U.S. Patent No. 5,712,908<br>U.S. Patent No. 5,757,784 (in combination with three other references)<br>The Belle Systems' Internet Management System (in combination with U.S. Patent No. 6,308,148) |