# EXHIBIT U

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

-----------------------------------

AMDOCS (ISRAEL) LIMITED,

Plaintiff,

v. Civil Action

OPENET TELECOM, INC., a Delaware No. 110-CV-910

Corporation, and OPENET TELECOM,

LTD., an Irish Corporation,

Defendants.

-----------------------------------

CONFIDENTIAL

30(b)(6) VIDEOTAPED DEPOSITION OF TAL GIVOLY

New York, New York

Thursday, February 10, 2011

Reported by:

Amy A. Rivera, CSR, RPR, CLR

JOB NO. 27867

CERTIFIED COPY

CONFIDENTIAL

February 10, 2011

9:07 a.m.

30(b)(6) Videotaped deposition of TAL GIVOLY held at the offices of Wilmer Hale, 399 Park Avenue, New York, New York before Amy A. Rivera, Certified Shorthand Reporter, Registered Professional Reporter, Certified LiveNote Reporter, and a Notary Public of the State of New York.

APPEARANCES:

WILMER HALE
Attorneys for Plaintiff
399 Park Avenue
New York, New York 10022
(212) 937-7201
BY: NELS T. LIPPERT, ESQ.

WILEY REIN, LLP
Attorneys for Defendants
1776 K Street NW
Washington, D.C. 20006
(202) 719-7416
BY: ERIC H. WEISBLATT, ESQ.

ALSO PRESENT:
TERRY CARRUTHERS, Legal Video Specialist
ALDERSON REPORTING

TAL GIVOLY - CONFIDENTIAL

Mr. Schweitzer contribute to those ideas?

A. At some point, we started getting more employees that joined the process, and the other -- yeah, so ...

Q. Who was the first employee who joined the process?

A. I don't recall.

Q. Do you recall when it was the first employee joined?

A. I don't recall.

Q. In looking at the subject matter of the first claim of the '065 patent, and who contributed to that subject matter, does any name come to your mind other than you, Mr. Wagner and Mr. Schweitzer?

A. No.

Q. Would that be true of the other claims of the '065 patent?

A. I'll read them.

(Pause.)

A. I don't see here anything that was not conceived by the combination of Eran, Limor and myself.

Q. You mentioned that there was a flurry of activity in the summer of 1997, including meetings.

TAL GIVOLY - CONFIDENTIAL

Who was at those meetings?

A. Each meeting had different participants. So, it might have been -- so, it might be Limor and myself, it might be Eran, Limor, and myself. It might be Eran and Limor. It might be one of the additional employees that were at the time.

Q. Do you recall the name of any of these -- and I want to -- I want to focus on this, what you recovered to as the flurry of activity in the summer of '97.

A. Yeah.

Q. Do you recall the names of any of those employees?

A. There was -- there -- three names come to mind. Yuval Tal --

Q. Can you --

A. -- Y-U-V-A-L, first name. Last name is T-A-L.

One of them is Eitan Elkin. That's E-I-T-A-N, space, last name is E-L-K-I-N.

And another one is Gil Shai. G-I-L, S-H-A-I or S-H-A-Y, I don't remember how he spells his last name.

So -- and they -- okay. Those are --

TAL GIVOLY - CONFIDENTIAL

Q. Anyone else you can remember for --

A. Those are early -- the earliest employees, I believe.

Q. What was Mr. Tal's role in that -- in -- in 1997?

A. Yuval, Mr. Tal, he consulted for Xpert Unix Systems, and he was involved in the development of XaCCT 2.0, and maybe -- and he worked with Xpert Unix Systems on various projects.

He was a soldier at the time, and he had some part-time -- only part-time ability to contribute.

Q. Was he a programmer? Was he --

A. He's a -- he's a whiz -- he's a -- he's developer, he's a whiz. He's a very strong developer.

Q. And Mr. Elkin, what was his --

A. He was a developer.

Q. Was he at Xpert Unix?

A. No, not to my knowledge.

Q. And Mr. Shai?

A. Mr. Shai, yeah, Gil Shai.

Q. Shai. Sorry.

A. He also was -- was a soldier that worked

TAL GIVOLY - CONFIDENTIAL

actually under Yuval in the unit in the Army, and I think that's how we got to him.

Most of the role of Yuval -- most of the role of Gil and Eitan was really developing what we had designed.

Q. Was that -- when you say, "Developed what we had designed," was that -- the "We" in that sentence Mr. Schweitzer, Mr. Wagner and you?

A. Yes, mostly.

Q. Now, were there further iterations of the product that you've referred to as XaCCT 2.0. For example, was there an XaCCT 2.1?

A. Yes.

Q. Was there an XaCCT 2.2?

A. I don't believe so.

Q. Were there further subdivisions to XaCCT 2.1? For example, was there an XaCCT 2.1.1, or some other --

A. I don't believe so.

Q. Okay.

Then was there an XaCCT 3.0?

A. Yes.

Q. Were there further iterations of the XaCCT 3.0 product?

TAL GIVOLY - CONFIDENTIAL

A. Yes.

Q. What were they referred to as?

A. There was -- these are versions I remember: 3.1, 3.3, 3.3, 3.4, 4.0, 4.1, and so on. And there's a 5 and 6, and we could go on, but at least those versions, major versions.

Q. Now, when you -- when I look through the documents, I -- I start coming across the name of a product which is XaCCT, X-A-C-C-T, "usage" --

A. Yes.

Q. -- U-S-A-G-E.

Is that product related to any of the ones you just mentioned?

A. Yes. Actually, the numbers that -- that I just mentioned are not all branded "XaCCT." XaCCT was the name of XaCCT 2.0 and 2.1. I don't remember whether 3.0 was called XaCCT 3.0, but at some point in time we renamed the product itself to be XaCCT"usage," but the numbering scheme continued.

So, XaCCT, effectively -- XaCCT 3.0 evolved into XaCCT"usage," and later, it evolved further.

Q. When XaCCT 3.0 evolved into XaCCT"usage" 3.0 -- was it called XaCCT"usage" 3.0?

TAL GIVOLY - CONFIDENTIAL

A. There was never a time, to my knowledge, that they were called both one or -- both of them. I don't remember whether XaCCT 3.0 was the one that was called already XaCCT"usage" or whether it was XaCCT 3.4 or 3.3. I don't remember when we started calling it XaCCT"usage" exactly. But, at some point, there was XaCCT"usage."

So, there's not XaCCT 3.0 and an XaCCT"usage" 3.0. There's either XaCCT"usage" 3.0. or XaCCT 3.0.

Q. Do you recall the functional differences, if any, between XaCCT 3.0 and XaCCT 2.1?

A. More or less.

Q. What were they?

A. XaCCT 3.0 was a complete rewrite -- not rewrite, it's actually a write -- a new -- a new project from scratch.

XaCCT 2.1 was a minor bug fix, minor feature capability improvement on 2.0 for customers that were using 2.0 and demanded it.

It was a distraction to some degree for the company, and it actually came after 3.0.

So, 3.0 development was what the company

TAL GIVOLY - CONFIDENTIAL

was created to do. So, 3.0 is complete -- is writing from scratch different technologies, and they embodied a complete different architecture. It's a -- it's very different.

Q. Could XaCCT 2.0 collect usage data from Internet service providers?

A. Only from a Check Point FireWall-1.

Q. Could it collect the usage data for the large enterprises?

A. From the same -- only from that source.

And, from that perspective, it was very limited. I mean, it -- it couldn't handle, actually, most of the problem domain.

Q. Because it couldn't handle the different sources that had proliferated?

A. Different sources, multiple sources, multiple instances of the source, more complex, sophisticated processing, and many, many more things.

Q. Now, in the activity that occurred in the summer of 1997, were there meeting minutes created?

A. Yes.

Q. Have you seen those meeting minutes

recently?

A. No.

Q. Do you know who was responsible for writing the minutes?

A. Me.

Oh, by the way, the "No," there is a -- I did see some, but not necessarily that summer.

But I did see meeting minutes. I don't remember which though. So ...

Q. Well, I wanted to -- I wanted to focus on that -- on 1997.

A. I don't recall whether they were from that time or not.

I did see meeting minutes. I don't remember from which meetings and from which times.

Q. Did you keep, whether electronically or paper copies, of the minutes yourself?

A. Yes.

Q. Were they stored in a particular file?

A. I don't understand the question.

Q. If you wanted to find the meeting minutes from 1997 today --

A. Yes.

Q. -- Mr. Givoly, where would you look?

TAL GIVOLY - CONFIDENTIAL

A. Where would I look?

I don't know.

Q. Is there an archive of documents that were created while XACCT was in existence?

A. Yes.

Q. Do you know if it goes back to the summer of 1997?

A. Yes.

Q. So, it does go back to the summer --

A. Yes.

Q. -- of '97?

Who is the custodian of that archive, do you know?

A. I held onto some of the documents. Not all documents made it into what was still in my possession.

Q. Do you know whether any of the other people who participated in those meetings in 1997, whether they also kept personal copies of the minutes?

A. I highly doubt it. I don't think so.

I don't know, though.

Q. For this litigation, Mr. Givoly, did you turn all of those minutes over to the lawyers to be

produced?

A. The minutes are lost. The minutes, we don't know where they are. Okay?

The documents that were generated as a result of this minutes, were certainly -- all documents that existed were turned over. I put everything, every document that I have, on a server that was -- that was made accessible to counsel.

Q. And if you had copies of these minutes, it would have been put on that server?

A. Yes.

Q. Do you recall seeing copies of those minutes when you were doing this?

MR. LIPPERT: Are you talking about the 1997 --

MR. WEISBLATT: Yes --

MR. LIPPERT: -- or minutes period.

MR. WEISBLATT: -- in -- in particular, the 1997 minutes.

A. I don't recall whether they were -- whether I found any of those.

Q. Was there any other computer file or paper file that you didn't look through that might have these minutes in them?

TAL GIVOLY - CONFIDENTIAL

A. Not that I'm aware of.

Q. Do you know the reason why the XaCCT 2.0 and 2.1 products were limited to the Check Point Firewall product?

A. The -- could you rephrase or -- let me -- could you explain the question again?

Q. Sure. Sure.

You had mentioned, I believe, that one of the weaknesses of the XaCCT 2.0 product and the end of 2.1 product was that it was --

A. I didn't say the 2.1.

Q. Okay. So, let's start with 2.0.

2.0 product was limited to use alongside of the Check Point source?

A. Yes.

Q. Okay.

Do you know why 2.0 was limited to the Check Point source?

A. No.

Q. Did there come a time where the number of sources for the 2.0 product, there was a desire to expand it past the Check Point?

A. Yes.

Q. Was that what resulted in the 2.1

TAL GIVOLY - CONFIDENTIAL

product?

A. It more from -- more, it actually created the company XACCT than the -- than the 2.1 product. So, the company XACCT in the 3.0 version are more of a result of the feedback and the uptake of 2.0.

2.1 is a -- is just a consequence of needing to support 2.0 customers.

Q. Was the consequence of supporting 2.0 customers meaning expanding the sources that the program could --

A. I believe so.

Q. Do you recall what other -- what other sources were useful with 2.1 other than Check Point?

A. Yes.

Q. What were they?

A. Proxy log.

Q. P-R-O-X-Y-L-O-G?

A. Yeah.

Q. One word?

A. Proxy is one word, log is another.

Q. Okay.

Is that a name of a company?

A. No.

TAL GIVOLY - CONFIDENTIAL

Q. Okay.

What's the company that made proxy log?

A. Many companies make proxy -- make -- make proxies, web proxies.

Web proxies produce proxy logs. And proxy logs have a particular format were readable by 2.1.

Q. Was there any other expansion other than into the proxy logs?

A. I think so.

Q. What other sources were expanded in 2.1?

A. Oh, no, no. I don't -- I didn't say that.

Q. Okay.

What -- what did you mean by when you said, "Yes" to my question then?

A. Other capabilities were added to 2.1.

Q. Okay.

What capabilities were added to 2.1?

A. I don't recall.

Q. Who would be most knowledgeable about XaCCT 2.1?

A. Udi Hershkovich.

Q. Anyone else who would be knowledgeable

TAL GIVOLY - CONFIDENTIAL

about 2.1?

A. Maybe. I think Udi would be, but it could also Eran or Limor might know something about it.

Q. Mr. Schweitzer and Mr. Wagner?

A. Yes.

Q. Did the effort to permit the XaCCT 2.0 product to be expanded to proxy log, did that involve the writing of additional software?

A. Yes.

Q. Okay.

You called it a "Distraction," 2.1 a "Distraction."

Was the distraction that some of the development work at XACCT, instead of being devoted to 3.0, had to be devoted to this software rewrite for 2. 1?

A. Not exactly.

Q. Okay.

What was -- why did you think 2.1 was a distraction then?

A. The main thrust of the activities, I would say, 90 plus percent of the effort was devoted to 3.0.

We released the 2.1 version in order to support customer requests for capabilities in -- in the product that they've already purchased, for instance. But we used very, very little effort to do that.

Q. Was part of the impetus to create 3.0 the idea of broadening the number of sources --

A. Yes.

Q. -- that could be accessed?

Was that the main goal of 3.0, would you say?

A. That's one of them.

Q. Okay.

What would be some other main goals of 3.0, as opposed to 2.0 or 2.1?

A. Making the ability to correlate with multiple sources, correlation of data in realtime with multiple sources, running on multiple -- more platforms, having a more scalable solution that would scale to support larger networks, and any number of devices and sources and correlation sources and processing, and so on.

Q. You mentioned one of them was the idea -- I believe it was realtime?

TAL GIVOLY - CONFIDENTIAL

the time period between the day of -- that you selected as conception, July 30th, 1997, and the filing date of that provisional application, November 20th, 1997.

At that -- between those two dates, was any software created that was capable of performing the methods claimed in the '065 patent?

A. Software was created, but it was not finished.

Q. If you look at the claims of the '065 patent, Mr. Givoly, could the software -- was the -- had the software been created -- had software been created between July 30th and November 20th 1997 that could function in accordance with the claims of the '065 patent?

A. I don't know.

Q. Okay.

Some of the claims are directed to a computer program product.

Between July 30th and November 20th, had there been created a computer program product that could perform in accordance with those claims?

A. The product was not complete. It -- it was not complete in 1997. So, as far as I could

tell, it can't -- it couldn't have been completely functional in November of 1997.

Q. But even though it was not fully functional for a commercial product, or hadn't been, as you call it, completed, between those two dates, July 30th and November 20th, did you have a computer program product that would function in accordance with the claims of the '065 patent?

A. I don't know exactly when.

Any capability specific would have been -- this is, again, 13 years ago. I don't remember exactly when every little piece of software was operational. But I could say that, just in general, getting it all together was probably something that happened towards the end of the development of it rather than the intermediary.

Q. You see, that's -- that's one of the issues that I have, getting it all together in terms of a commercial product, in terms of something you're happy with that you could call complete, I want to put those aside now and just direct yourself to the claimed inventions.

A. Yeah, we would want to get this product out as soon as possible.

TAL GIVOLY - CONFIDENTIAL

VIDEOGRAPHER: This is the end of Tape No. 5.

The time is 4:35.

We're going off the record.

(Recess.)

VIDEOGRAPHER: The time is 4:53.

We're back on the record.

This is Tape No. 6.

MR. WEISBLATT: I'd like to mark as the next exhibit a document bearing production numbers 6090 through 6097.

(Exhibit Givoly 14, a document bearing production numbers 6090 through 6097, was marked for identification at this time.)

BY MR. WEISBLATT:

Q. Mr. Givoly, I've marked a version of the XaCCT 3.0 vision statement dated June 23rd, 1997. And if you go to the second page -- and I believe that they're all double-sided copied -- those are the -- that's your signature that you wrote it?

A. Yes.

Q. And do you recognize the signatures of Mr. Schweitzer and Mr. Wagner?

A. Yes. I -- I had them sign it.

Q. Was this one of the documents that AMDOCS relied on in determining a conception date for the '065 patent of July 30th 1997?

A. It's one of the set.

Q. Okay.

If you go to the Page 6094.

Now, this document is a vision statement.

Is it designed to memorialize what you wanted XaCCT 3.0 to do?

A. Some of it.

But, again, in a very course-grain, high-level passion. It's a short document.

Q. And if we look at 2.2, you wrote that "XaCCT 3.0 should maintain all the functionality of XaCCT 2.0, plus that of all specialized versions of XaCCT 2.0, plus the functionality of XaCCT 2.1."

Do you see that?

A. Yep.

Q. What were the specialized versions of 2.0?

A. I seem to recall that there were some customers for which there were customizations, or changes, versus the core 2.0 capabilities.

for and buy?

A. First of all, I didn't know that this is a PR from XACCT. Okay? But it is a report about XaCCT. That's one thing.

The other thing is we would love people to come and try to buy the product from us. So, if this creates a demand for the product, that would be great.

The sales cycle typically is very long for the product. And, again, I -- I don't -- this says that it was released, it could be accurate, I just don't know.

Q. Okay.

MR. WEISBLATT: Let's mark as the next document Exhibit 18, document bearing production numbers 7098 to 7100.

(Exhibit Givoly 18, a document bearing production numbers 7098 to 7100, was marked for identification at this time.)

Q. This is a news release from XACCT, and it's dated March 19th, 1998, which is about halfway down on the first page. And it mentions a conference called CeBIT, C -- capital C, lower case E, capital B, capital I, capital T.

TAL GIVOLY - CONFIDENTIAL

Do you know what that is?

A. Yes.

Q. That's a trade show held every year in Hanover?

A. Yes.

At least at the time it was. I'm not sure right now it continues.

Q. Okay.

And March 19th, 1998, XACCT announced it was shipping XaCCT 2.1?

A. Yes.

Q. Okay.

And that you would be demonstrating the upcoming version of XaCCT 3.0?

A. Where is that?

Q. That's the second paragraph after -- under Hanover. There's a single line.

A. Yes.

Q. Okay.

Do you know what was demonstrated at the 1998 CeBIT conference by XACCT in terms of its 3.0 product?

A. I'm -- I think -- I think I do.

Q. What -- what was it?

TAL GIVOLY - CONFIDENTIAL

A. I think it was a user interface prototype that I had created.

So, it's not the 3.0 product, but it's a user interface mockup that I had whipped up.

Q. Have you seen any documents that reflect what was going to be -- or what was demonstrated at that 1998 trade show?

A. I don't recall.

Q. Okay.

And if you go to the next page, 7099, it says, "XaCCT 2.1" -- I'm looking at the very bottom -- "Is available directly from XACCT Technologies Limited and its distributors."

A. And it's subsidiaries.

Where is that that you're saying?

Q. It's about -- it's just about an inch up from the bottom.

A. Where is that?

Q. On the second page. It's double-sided again, I'm sorry.

A. Sorry.

Q. It says, "XACCT 2.1 is available directly from XACCT Technologies" --

A. Yes.

CERTIFICATE

I, AMY A. RIVERA, a Certified Shorthand, Registered Professional Reporter, Certified LiveNote Reporter, and Notary Public of the State of New York, do hereby certify that prior to the commencement of the examination TAL GIVOLY, was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

Amy A. Rivera

Notary Public of the State of New York

My commission expires August 28, 2014

License No. XI00939

Dated: February 10, 2011

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

---------------------------------------x

AMDOCS (ISRAEL) LIMITED,

Plaintiff, Civil Action

- vs - NO. 110-CV-910

OPENET TELECOM, INC., a Delaware Corporation, and OPENET TELECOM, LTD., an Irish Corporation,

Defendants.

---------------------------------------x

March 3, 2011

9:24 a.m.

Vol. III

Continued videotaped 30(b)(6) notice deposition of AMDOCS (Israel) Limited by TAL GIVOLY, taken by Defendants, pursuant to Adjournment, at the offices of Wilmer Cutler Pickering Hale and Dorr LLP, 399 Park Avenue, New York, New York, before Linda D. Danelczyk, a Registered Professional Reporter, Certified Court Reporter, and Notary Public of the States of New York and New Jersey.

CERTIFIED COPY

A p p e a r a n c e s:

WILMER, CUTLER PICKERING and DORR LLP
Attorneys for Plaintiff
399 Park Avenue
New York, New York 10022
Phone: (212)937-7201
E-Mail: nels.lippert@wilmerhale.com
BY: NELS T. LIPPERT, ESQ.

WILEY REIN LLP
Attorneys for Defendants
1776 K Street NW
Washington, D.C. 20006
Phone: (202)719-7049
E-Mail: eweisblatt@wileyrein.com
BY: ERIC H. WEISBLATT, ESQ.

ALSO PRESENT:
TERRY CARRUTHERS, Legal Video Specialist
Alderson Reporting

T. Givoly

Q. Did you tell anyone that you felt you should be an inventor on that application?

A. I might have. I don't recall.

Q. Do you recall being involved in changing the inventorship of that application?

A. I recall that there was a process, that there was filing and that there was a change in order to include me as an inventor.

Q. In pursuing the change in inventorship, sir, did you create any writing to document what contribution you made to the subject matter of the claims of the '984 patent?

A. I don't recall.

Q. Do you know whether anyone created a memorandum or a document that described your contribution to the concept of the claims of the '984 patent that would require you to be added as an inventor?

A. I don't recall.

All of this would have probably been 13 years ago, so...

Q. Now, I've also shown you or given you a copy of the supplemental augmented initial disclosures of AMDOCS. I believe it's exhibit --

T. Givoly

we marked it as Exhibit 10 before.

A. Yes.

Q. And if you go to the second page of that document, you can see that the date of conception for Claims 1 through 14 is asserted to be July 30th, 1997.

Do you see that?

A. Yes.

Q. Now, I had asked you before how that date was arrived at.

Do you recall, sir?

A. Yes.

Q. Do you know how that date was arrived at?

A. I believe it was when the, more or less last of the series of documents that were produced in the June-July time frame -- the bulk of those was complete.

Q. We -- as representatives of Openet, we were served a letter, yesterday I believe, that listed the documents that pertained to conception of the patents-in-suit, including the '984 patent.

Did you have any hand in writing that letter, Mr. Givoly?

T. Givoly

A. Not that I recall.

Q. Okay.

MR. WEISBLATT: What exhibit are we up to?

THE COURT REPORTER: 60.

MR. WEISBLATT: 60. All right.

I want to make sure I have in the record the group of documents that we were -- that were described to counsel for Openet. So I want to mark in succession that group of the XaCCT 3.0 documents that were specified in the letter.

The first one, which would be Exhibit 60, is document 5869 to 5874.

(Whereupon, document Bates-stamped 5869 to 5874, was marked as Givoly Exhibit 60 for identification, as of this date.)

MR. WEISBLATT: 61 would be document 5906 through 5912.

(Whereupon, document Bates-stamped 5906 through 5912, was marked as Givoly

T. Givoly

Exhibit 61 for identification, as of this date.)

MR. WEISBLATT: 62 would be document 5875 through 5904.

(Whereupon, document Bates-stamped 5875 through 5904, was marked as Givoly Exhibit 62 for identification, as of this date.)

MR. WEISBLATT: 63 would be document 5943 through 5966.

(Whereupon, document Bates-stamped 5943 through 5966, was marked as Givoly Exhibit 63 for identification, as of this date.)

BY MR. WEISBLATT:

Q. The next one I want to give you, sir, has already been marked as Exhibit 14 during your prior deposition.

(Whereupon, XaCCT 3.0 Vision Statement, Bates-stamped 6090 through 6097, was previously

T. Givoly

marked as Givoly Exhibit 14 for identification, as of this date.)

MR. WEISBLATT: Exhibit 64 is document Bates number 4896 through 5003.

(Whereupon, document Bates-stamped 4896 through 5003, was marked as Givoly Exhibit 64 for identification, as of this date.)

MR. WEISBLATT: Exhibit 65 is 341852 through 341860.

(Whereupon, document Bates-stamped 341852 through 341860, was marked as Givoly Exhibit 65 for identification, as of this date.)

MR. WEISBLATT: 66 is Bates number 6000 through Bates number 6012.

(Whereupon, document Bates-stamped 6000 through 6012, was marked as Givoly Exhibit 66 for identification, as of this date.)

T. Givoly

MR. WEISBLATT: 67 is Bates number 6217 through 6231.

(Whereupon, document Bates-stamped 6217 through 6231, was marked as Givoly Exhibit 67 for identification, as of this date.)

MR. WEISBLATT: 68 is 6139 through 6160.

(Whereupon, document Bates-stamped 6139 through 6160, was marked as Givoly Exhibit 68 for identification, as of this date.)

MR. WEISBLATT: 69 is 5913 through 5940.

(Whereupon, document Bates-stamped 5913 through 5940, was marked as Givoly Exhibit 69 for identification, as of this date.)

MR. WEISBLATT: 70 is 342230 through 342237.

(Whereupon, document Bates-stamped 342230 through 342237, was marked as Givoly

Exhibit 70 for identification, as of this date.)

MR. WEISBLATT: 71 is 6100 through 6109.

(Whereupon, document Bates-stamped 6100 through 6109, was marked as Givoly Exhibit 71 for identification, as of this date.)

MR. WEISBLATT: 71 is 6072 --

THE COURT REPORTER: I think that's 72.

MR. LIPPERT: The previous one was 71.

MR. WEISBLATT: Ah, thank you. 72 is 6076 through 6088.

(Whereupon, document Bates-stamped 6076 through 6088, was marked as Givoly Exhibit 72 for identification, as of this date.)

MR. WEISBLATT: 73 is 342125 through 342136.

(Whereupon, document Bates-stamped 342125 through 342136, was marked as Givoly Exhibit 73 for identification,

T. Givoly

as of this date.)

MR. WEISBLATT: And 74 is 6057 through 6075.

(Whereupon, document Bates-stamped 6057 through 6075, was marked as Givoly Exhibit 74 for identification, as of this date.)

BY MR. WEISBLATT:

Q. Now, Mr. Givoly, I have given them to you -- I happen to put them in order of the dates that I found on the first page. And indeed, the date of the last one is July 30th, 1997, Exhibit 74.

A. Yes.

Q. And because that is the date of the last of these documents, is that how the conception date of July 30th, 1997 was derived?

A. I believe so.

Q. Mr. Givoly, did you go through the documents 60 through 74 and determine which parts of the conception of the subject matter of the claims of the '984 patent were disclosed in each individual document?

C E R T I F I C A T E

STATE OF NEW YORK )
) §.:
COUNTY OF NEW YORK )

I, LINDA D. DANELCZYK, a Registered Professional Reporter, Certified Court Reporter, and Notary Public within and for the States of New York and New Jersey, do hereby certify:

I reported the proceedings in the within entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of March, 2011.

LINDA D. DANELCZYK, RPR, CCR
License No. 30X100188700 - N.J.
My Commission Expires:
11/24/2013 - No. 2046964
License No. 001002 - N.Y.
My Commission Expires:
9/20/2014 - No. 01DA4952883