# EXHIBIT V

HIGHLY CONFIDENTIAL

**CERTIFIED TRANSCRIPT**  Page 1

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF VIRGINIA

3  ALEXANDRIA DIVISION

4  ------------------------------------x

5  AMDOCS (ISRAEL) LIMITED, an           )

6  Israeli corporation,                  )

7           Plaintiff,                   )  Case No.

8           v.                           )  1:10-CV-910

9  OPENET TELECOM, INC., a               )  (LMB/TRJ)

10 Delaware corporation, et al.,         )

11          Defendants.                  )   **HIGHLY CONFIDENTIAL**

12 ------------------------------------x

13

14            **HIGHLY CONFIDENTIAL**

15

16 Videotaped Deposition of MICHAEL I. SHAMOS, Ph.D.

17            Washington, DC

18            Wednesday, May 4, 2011

19            9:18 a.m.

20

21

22 Reported by: Lee Bursten, RPR, CRR

HIGHLY CONFIDENTIAL

Page 2

1    Videotaped deposition of MICHAEL I. SHAMOS,
2    Ph.D., held at the offices of:
3
4
5    WILMER CUTLER PICKERING HALE
6    AND DORR LLP
7    1875 Pennsylvania Avenue, NW
8    Washington, DC 20006
9    (202) 663-6000
10
11
12
13
14    Pursuant to Notice, before Lee Bursten,
15   Registered Professional Reporter, Certified Realtime
16   Reporter, and Notary Public in and for the District
17   of Columbia, who officiated in administering the
18   oath to the witness.
19
20
21
22

Page 3

1              A P P E A R A N C E S
2     ON BEHALF OF PLAINTIFF:
3           S. CALVIN WALDEN, ESQUIRE
4           LAURA A. SHERIDAN, ESQUIRE
5           WILMER CUTLER PICKERING HALE
6           AND DORR LLP
7           399 Park Avenue
8           New York, New York 10022
9           (212) 230-8800
10
11    ON BEHALF OF DEFENDANTS AND THE WITNESS:
12          JAMES H. WALLACE, Jr., ESQUIRE
13          WILEY REIN LLP
14          1776 K Street, NW
15          Washington, DC 20006
16          (202) 719-7000
17
18    ALSO PRESENT:
19          DANA L. CAMPBELL, CLVS, Videographer
20
21
22

HIGHLY CONFIDENTIAL

Page 77

1  determine the effectiveness of Internet advertising.
2  Typically, the way that a system would output that
3  information would be in the form of a report
4  intended for a manager, that would say, here are all
5  your ads, and we did these experiments, when I say
6  "we," I mean the computer, the computer did these
7  experiments, and here are the summarized results of
8  the experiments, here is a measure of effectiveness
9  for each of the ads that we tested.
10            And so the report would be -- since this
11 is a computer system, it would probably be rendered
12 in machine readable form, but possibly capable of
13 being printed out so that it could be passed around
14 from human to human.  I think that's what report
15 generation is.
16      Q    What is the difference between a record
17 and a report?
18      A    Oh, a report is of I think much more
19 general form.  A report could consist of a single
20 sentence.  A report could consist of multiple
21 volumes of printed and bound paper.  The concept of
22 report indicates that something has occurred and it

HIGHLY CONFIDENTIAL

Page 78

1  has to be reported to somebody, that is, somebody
2  has to be informed of what the results of something
3  were.
4        And so I think report and record are just
5  orthogonal concepts.  A report might be contained in
6  a record, or might not be contained in a record.  I
7  don't think there's a relationship between them.
8        Q    What do you mean, "orthogonal concepts"?
9        A    They're separate.  The notion of a record
10 has no impact on the understanding of report.  And
11 understanding of "report" has no impact on
12 understanding of "record."
13       Q    Will a person of ordinary skill in the art
14 be confused as to the difference between a report
15 and a record?
16       A    I think one of ordinary skill in the art
17 would understand that there's no necessary relation
18 between them.
19       Q    That they're different things?
20       A    That a report and a record are different
21 things?
22       Q    Yes.

```
 1        A    Yes.
 2        Q    All right.
 3             MR. WALDEN:  Why don't we take a quick
 4   break.
 5             THE VIDEOGRAPHER:  Going off record at
 6   10:38:19.
 7             (Recess.)
 8             THE VIDEOGRAPHER:  We're back on record at
 9   .
10   BY MR. WALDEN:
11        Q    Dr. Shamos, if you would, pull back out
12   Shamos Exhibit 1, your report.  If you would like to
13   look at it online, please do.  Turn to page 2 of
14   your report, paragraph 10.
15        A    Yes.
16        Q    And the last sentence of that paragraph
17   you state, "I have not made any independent
18   determination of relevant dates of invention or
19   publication with respect to the '065 and '797
20   patents."
21             Is that still true?
22        A    Yes.
```

HIGHLY CONFIDENTIAL

Page 171

1  Q    So what did 2.0 do to assist in that?

2  A    It collected information about the
3  services that were performed, and produced records
4  from which bills could be created.

5  Q    That's 2.0?

6  A    Yes.

7  Q    Okay. If it is the case that 3.0 --
8  strike that. Do you have an opinion as to whether
9  the 3.0 is prior art to the '065 patent?

10 A    I think -- well, what I've said is in my
11 report, I don't opine on dates, except as to those
12 that are clear from the faces of documents. So for
13 example, if you tell me a date of invention, I can
14 look at the face of a patent and I can determine
15 whether it's prior art or not.

16      There's argument and evidence around as
17 to -- there's documentation that pertains to 3.0,
18 whether that was a printed publication or not,
19 whether it was publicly accessible or not, there
20 will be testimony on that. There was a system 3.0
21 that was actually distributed and used. There will
22 be testimony on what the date of that was.

1           There will be other testimony on what the
2  date of invention was, to the extent it might be
3  different from the filing date of the patent.  I
4  don't get into that.  At trial, long before I get up
5  to testify on invalidity, the witnesses will be
6  heard, there will be motions to the Court as to
7  which prior art references are going to be admitted
8  as prior art references, and I'll work with what
9  there is.
10       Q    All right.  Is 2.0 an anticipatory
11  reference with respect to the '065 patent?
12       A    Yes, I believe so.  And the reason I
13  believe so is because I'm assured that there will be
14  testimony that for the purposes of the asserted
15  claims in my two patents, that there are no
16  substantive differences among 2.0, 2.1, and 3.0.
17       Q    The only cites in your invalidity charts
18  for the exact system are to 3.0, correct?
19       A    Yes, because we couldn't do all of them.
20  We had to pick one because of the agreement to
21  restrict the number of references.
22       Q    So abiding by the agreement, shouldn't you

1    Suppose if it were given to me by God, it wouldn't
2    change anything in the program.  The origin of where
3    this enhancement comes from is of no structural
4    significance to the patent.
5             Furthermore, every piece of software,
6    unless it is completely random, implements a policy.
7    And in fact, even a random program implements a
8    policy, that is, the policy of randomness.  So I'm
9    not seeing what saying it's based on a policy adds
10   to any claim.
11            If you said, wherein the system provides a
12   mechanism for implementing policies, that might be a
13   structural limitation, but I just don't get it.
14   Every computer program is based on a policy.
15        Q    Let's do a hypothetical, if we could.
16        A    Yes.
17        Q    You have two computers sitting side by
18   side on this desk, right?
19        A    Yes.
20        Q    They both contain call detail records.
21        A    Yes.
22        Q    That are identical in type.

1       A       Yes.

2       Q       You access the records from the one
3   computer, is that a first source?

4       A       Wait a second.  I thought they already had
5   records describing the services.  You mean -- okay,
6   what -- I'm sorry.

7       Q       You've got -- there's two computers --

8       A       As a network element?

9       Q       -- sitting side by side, right across from
10  you, right.

11      A       Okay.

12      Q       Assume they're network elements.

13      A       Oh, okay.  They're producing call detail
14  records?

15      Q       Yes.  Exactly.

16      A       Fine.

17      Q       Of an identical type, and they're
18  identical type network elements, okay?

19      A       Yes.

20      Q       In other words, there's nothing that you
21  can tell is a difference except there's two of them
22  over there.

1   A    And I know that they're different because
2   they're connected through different ports, but...
3   Q    Fair.
4   A    Right.
5   Q    So you connect to one using one port and
6   you collect those, is that a first source?
7   A    That --
8   Q    As that term is used in the '065 patent?
9   A    That can be, yes.
10  Q    And then you collect the same, precisely
11  the same records from the same computer that's
12  sitting right there on that desk right in front of
13  you, is that a second source?
14  A    Yes.
15  Q    And that's -- in your view, that's a first
16  source and a second course as covered by the claims
17  of the '065 patent, even though the network element
18  is identical and the type of record is identical?
19  A    Yeah, they're coming from different
20  places.
21  Q    Right.  One -- six inches apart?
22  A    Well, we don't know that.

HIGHLY CONFIDENTIAL

Page 323

1  Q    That's what my hypothetical is.  We do in
2  my hypothetical.
3  A    But the system doesn't know that, it's
4  just -- data is coming in on a line, it doesn't know
5  where these things are.
6  Q    Fair enough.  So let's move to Exhibit 12,
7  back to Exhibit 12, if you would, '128 patent.
8  A    Yes.
9  Q    And back to claim 1.
10 A    Yes.
11 Q    In the --
12 A    Hang on.
13 Q    Where in the '128 patent is the disclosure
14 of computer code for receiving from a first source a
15 first network accounting record?
16 A    We didn't go through this?
17 Q    Not precisely.
18 A    Call activity record.  It's the first
19 network accounting record.  And when the network
20 accounting record is generated, they don't just sit
21 there.  They have to get received by somebody, or
22 they can't be used.

HIGHLY CONFIDENTIAL

Page 329

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2            I, Lee Bursten, the officer before whom
3  the foregoing deposition was taken, do hereby
4  certify that the foregoing transcript is a true and
5  correct record of the testimony given; that said
6  testimony was taken by me stenographically and
7  thereafter reduced to typewriting under my
8  direction; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10 this case and have no interest, financial or
11 otherwise, in its outcome.
12           IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 13th day of
14 May, 2011.
15
16 My commission expires June 30, 2014.
17
18
19
20 _____
21 NOTARY PUBLIC IN AND FOR
22 THE DISTRICT OF COLUMBIA